**Matthew Kaplan**, OSB No. 980699
KAPLAN LAW LLC
50 SW Pine Street Ste. 302
Portland, OR 97204
Phone: (503) 226-3844
matthew@mdkaplanlaw.com

**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St. Ste. 600
Portland, OR 97205
Phone: (503) 228-6474
nadia@sugermandahab.com

**Patrick Angel,** OSB No. 032672
ANGEL LAW PC
3 Centerpointe Drive
Lake Oswego, OR 97035
Phone: (503) 953-8224
patrick@angellawpc.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

GUY RAY NORMAN, personal
representative for the ESTATE OF
KATHLEEN MARGARET NORMAN,
deceased,

Plaintiff,

v.

WELLPATH, LLC, a Delaware corporation;
CORRECT CARE SOLUTIONS, LLC, a
Kansas corporation; YAMHILL COUNTY,
an Oregon county; DARLA PENA, an
individual; MICHAEL PETRASEK, an
individual; SCOTT MITCHELL, personal
representative of the ESTATE OF HAL
MITCHELL, D.O., deceased; TIM
SVENSON, an individual; JEREMY RUBY,
an individual; MICHAEL BROOKS, an
individual; and BARBARA SHIPLEY, an
individual.

Defendants.

Case No.: 3:19-cv-02095-MO

**SECOND AMENDED COMPLAINT FOR
VIOLATION OF CIVIL RIGHTS (42
USC § 1983) AND SUPPLEMENTAL
STATE CLAIMS**

**DEMAND FOR TRIAL BY JURY**

## INTRODUCTION

1.    On the afternoon of January 14, 2018, Kathleen Norman (then age 57) was taken by ambulance to Providence Newberg Medical Center for severe alcohol intoxication. Upon arrival she had a blood alcohol level (BAC) of .52. After approximately eight hours at the hospital receiving treatment for alcohol withdrawal Ms. Norman's blood alcohol level had decreased to .25. Ms. Norman was transported to the Yamhill County Jail because she had an outstanding arrest warrant for a DUII charge. Upon arrival at the jail, Ms. Norman told the jail staff that she was experiencing alcohol withdrawal. The nurse on duty did not take her vital signs, perform a physical examination, or do a detoxification assessment while Ms. Norman was in custody. She did not receive any medications or other treatment for alcohol withdrawal. Ms. Norman was placed in a medical observation cell where her medical needs were ignored. She was found dead approximately four hours later. If Ms. Norman had received appropriate treatment for alcohol withdrawal, she would not have died.

## JURISDICTION AND VENUE

2.    This action arises under the constitution and laws of the United States, and jurisdiction is based on 28 USC § 1331 and 28 USC § 1343(a). This Court has pendent jurisdiction of the state law negligence claims pursuant to 28 USC § 1367.

## PARTIES

3.    Plaintiff Guy Ray Norman is the duly appointed personal representative of the Estate of Kathleen Margaret Norman. Kathleen Norman was born in Portland, Oregon, on July 7, 1960. At the time of her death, Ms. Norman was a citizen and a resident of the State of Oregon. She is survived by her mother, Dolores Norman, her four siblings, and her nine nieces and nephews.

Page 2 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

4.      Wellpath, LLC ("Wellpath") is a Delaware corporation authorized to do business in the State of Oregon. Its business is providing medical services in jails and prisons nationally, and in the Yamhill County Jail specifically. Wellpath was formed in November 2018 as a result of a merger between Correct Care Solutions, LLC ("CCS") and Correctional Medical Group Companies. CCS was a Kansas corporation authorized to do business in the State of Oregon. In January 2018, CCS was providing the medical services at the Yamhill County Jail. At all times herein pertinent, Wellpath and CCS were acting under color of state law. Throughout this Complaint, they will be referred to as "Wellpath/CCS."

5.      Yamhill County is an Oregon county. Yamhill County operates a jail, and has contracted with Wellpath/CCS to provide all necessary medical care to pretrial detainees and persons convicted of crimes held at the Yamhill County Jail.

6.      Darla Pena is a licensed practical nurse (LPN) licensed by the State of Oregon. At all times pertinent, LPN Pena was employed by Wellpath/CCS as a nurse in the Yamhill County Jail. LPN Pena was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of her agency. On information and belief, she is a citizen and resident of the State of Oregon.

7.      Michael Petrasek is a registered nurse (RN) licensed by the State of Oregon. At all times pertinent, Nurse Petrasek was employed by Wellpath/CCS as a nurse and as Health Services Administrator in the Yamhill County Jail, responsible for the implementation of Wellpath/CCS's policies and procedures. Nurse Petrasek was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of his agency. On information and belief, he is a citizen and resident of the State of Oregon.

8.      The Estate of Hal Mitchell, through the personal representative, Scott Mitchell, is an estate established for the purpose of this lawsuit. Hal Mitchell, D.O. died on April 22, 2019. Dr. Mitchell was a doctor licensed by the State of Oregon. At all times pertinent, Dr. Mitchell was contracted by Wellpath/CCS to be available to provide medical services in the Yamhill County Jail. Dr. Mitchell was an agent of Wellpath/CCS, actual or implied, acting in a supervisory role and in a position to implement both policies and practices on behalf of Wellpath/CCS, within the course and scope of his agency. On information and belief, he was a citizen and resident of Oregon at the time of his death.

9.      Tim Svenson is the Sheriff of Yamhill County. At all times pertinent, Sheriff Svenson was an agent of Yamhill County, actual or implied, acting in a supervisory role and in a position to implement policies, customs, and practices on behalf of Yamhill County. In his position of Sheriff, he is responsible for ensuring that people being held at the Yamhill County Jail receive constitutionally adequate medical services. At all times said defendant was acting within the course and scope of his agency. On information and belief, he is a citizen and resident of the State of Oregon.

10.     Jeremy Ruby is a Yamhill County employee who at all times pertinent was head of the Corrections Division of the Yamhill County Sheriff's Office, and responsible for the day-to-day operations of Yamhill County Jail and in a position to implement both policies and practices on behalf of Yamhill County. He was responsible for ensuring that people being held at the Yamhill County Jail received constitutionally adequate medical services. Sergeant Ruby was an agent of Yamhill County, actual or implied, acting within the course and scope of his agency. On information and belief, he is a citizen and resident of the State of Oregon.

11.     Michael Brooks is a Yamhill County employee who at all times pertinent was working in the Yamhill County Jail as a corrections officer. Deputy Brooks was an agent of Yamhill County, actual or implied, acting within the course and scope of his agency. On information and belief, he is a citizen and resident of the State of Oregon.

12.     Barbara Shipley is a Yamhill County employee who at all times pertinent was working in the Yamhill County Jail as a corrections sergeant. Sergeant Shipley was an agent of Yamhill County, actual or implied, acting within the course and scope of her agency. On information and belief, she is a citizen and resident of the State of Oregon.

## YAMHILL COUNTY AND WELLPATH/CCS HAVE A DUTY TO PROVIDE MEDICAL CARE AT THE YAMHILL COUNTY JAIL

13.     The Yamhill County Jail houses pretrial detainees and persons convicted of crimes. Yamhill County and Sheriff Svenson are charged by law with the responsibility for administering, managing, and supervising the health care delivery system at the Yamhill County Jail. This duty to provide medical care to persons lodged in the Yamhill County Jail is a nondelegable duty.

14.     Commencing in 2017, Yamhill County contracted with Wellpath/CCS to administer and provide medical care to pretrial detainees and persons convicted of crimes lodged in the Yamhill County Jail. The contract states that Wellpath/CCS shall identify to the County and Sheriff those members of the jail population with medical or mental health conditions which may be worsened as a result of being incarcerated at the Jail, or which may require extensive care while incarcerated. After review of the circumstances, and when safety and security risks permit, the Sheriff shall use the reasonable best efforts and shall work with CCS to have such an

inmate/detainee released, transferred, or otherwise removed from the correctional setting, if this can be done while ensuring the reasonable safety and security of the inmate/detainee.

15.    The Oregon State Sheriffs Association Jail Standards publishes the Best Practice and Guidelines for the Operation of Jails in the State of Oregon. G-211 states that "If the jail has an outside medical provider, the jail must have a contract with a third party to do an audit of some jail medical files to determine if the outside provider is providing adequate health care …If the third party finds deficiencies, they should be documented and the outside medical provider should be required to correct the problem. The files should be selected at random, but the jail should make sure the sample of files includes high-risk inmates with serious medical needs – such as those with chronic care needs or pregnant inmates." The rationale given is, "Jail staff lack the medical training to determine whether an outside medical provider is providing adequate health care to inmates, and an outside medical provider may have a financial incentive to provide less care than is necessary. By having a third-party audit random medical files, the jail can get an objective opinion about the quality of health care being provided." Despite this important best practice Yamhill County chose not to have a third-party audit it's medical program in 2018, when Ms. Norman was a detainee.

16.    The National Commission on Correctional Health Care ("NCCHC") publishes "Standards for Health Services in Jails," considered an authoritative source for correctional health care standards. On information and belief, Wellpath/CCS promised that its healthcare services in Yamhill County would meet the NCCHC Standards.

17.    NCCHC Standard J-C-04 states it is "essential" that "A training program, established or approved by the responsible health authority in cooperation with the facility

administrator, guides the health-related training of all correctional officers who work with inmates." Such compliance indicators include:

- An outline of the training including course content and length is kept on file.

- A certification or other evidence of attendance is kept on site for each employee.

- All aspects of the standard are addressed by written policy and defined procedures.

18.    NCCHC Standard J-E-02 states it is "essential" that "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." Receiving screening is defined as "a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals…"

19.    NCCHC Standard J-G-01 states it is "essential" that "[p]atients with chronic disease, are identified and enrolled in a chronic disease program to decrease the frequency and severity of the symptoms, prevent disease progression and complication, and foster improved function."

20.    NCCHC Standard J-G-02 states it is "essential" that "[a] proactive program exists that provides care for special needs patients who require close medical supervision or multidisciplinary care." The standard lists those with alcohol abuse and patients with recent hospitalizations and emergency room visits as potential special needs patients that should be followed closely.

21.    NCCHC Standard J-G-06 states it is "essential" that "Patients with alcohol or other drug (AOD) problems are assessed and properly managed by a physician or, where permitted by law, other qualified health care professionals."

22.    NCCHC Standard J-G-07 states that it is "essential" that "[p]rotocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives, or opioids." NCCHC Standard J-G-07 lists a number of "Compliance Indicators," including:

- Established protocols are followed for the assessment, monitoring, and management of individuals manifesting symptoms of alcohol and drug intoxication or withdrawal.

- Individuals being monitored are housed in a safe location that allows for effective monitoring.

- Inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility.

- Individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using recognized standard assessments at appropriate intervals until symptoms have resolved.

- Detoxification is done under physician supervision.

23.    NCCHC Standard J-G-07 further explains that "[d]etoxification and withdrawal are best managed by a physician or other medical professional with appropriate training and experience. As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times."

## KATHLEEN NORMAN DIES IN THE YAMHILL COUNTY JAIL AFTER BEING DISCHARGED FROM PROVIDENCE NEWBERG MEDICAL CENTER

24.     On Sunday, January 14, 2018, at approximately 12:07 p.m., Don Norman called the Newberg-Dundee Police Department to report that his sister, Kathleen Norman, who had an outstanding arrest warrant for a misdemeanor DUII charge, was at her home. He had hoped this would help get his sister to a safe place and help her properly detox.

25.     An officer from the Newberg-Dundee Police Department was dispatched to Ms. Norman's home. The officer documented Ms. Norman "appeared to see us at the door, but was physically unable to rise from the chair. Medical issue was suspected. Medics arrived and found her to be dangerously intoxicated." The medics took her to Providence Newberg Medical Center.

26.     At approximately 12:57 p.m., Ms. Norman arrived at Providence Newberg Medical Center. Nurse Practitioner (NP) Sharon Southwick was the attending provider for Ms. Norman. NP Southwick diagnosed Ms. Norman with acute alcohol intoxication. Ms. Norman's initial BAC at the hospital was 0.522.

27.     The Yamhill County Sheriff's Office had a policy of not accepting custody of a person with a BAC greater than 0.25.

28.     Ms. Norman received 3 liters of saline IV fluids, Versed to keep her calm for her CT scan, and four doses of Ativan totaling 3.5 mg, for nausea, during the nearly nine hours she was at Providence Newberg Medical Center.

29.     Before discharging Ms. Norman, NP Southwick called the jail to speak with their medical staff to determine if the jail could treat a detoxing detainee. NP Southwick was told medical staff was unavailable, so she spoke with Sergeant Gardner. Sergeant Gardner told NP

Page 9 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

Southwick that, generally speaking, they can take care of patients who develop alcohol withdrawal symptoms once they are medically cleared.

30.     At approximately 9:11 p.m., Providence registered nurse, Andrew Bierer called the Newberg-Dundee Police Department to report that Ms. Norman was medically cleared and ready to be released to be taken to the jail. Newberg-Dundee Police Officer Daniel Fouch arrived at Providence Newberg Medical Center to transport Ms. Norman to the jail.

31.     Officer Fouch overheard Nurse Bierer saying that Ms. Norman was clear to leave but they were concerned about delirium tremens ("DTs"). Nurse Bierer told Officer Fouch that he would be available to provide assistance by phone. Nurse Bierer completed the discharge paperwork, which included a letter signed by Nurse Southwick stating Ms. Norman was cleared to go to jail, but to call if they have any questions or concerns.

32.     Officer Fouch took Ms. Norman into custody at approximately 9:49 p.m. He wrote that she seemed to have balance issues and she was "wobbly on her feet" and used his hand for stability. Officer Fouch initially took Ms. Norman to the Newberg-Dundee Police Department while he completed necessary paperwork, then took her to the Yamhill County Jail.

33.     Upon arrival, Officer Fouch informed Yamhill County Sheriff's Office Deputy Michael Brooks that Ms. Norman had a .25 BAC at 9:00 p.m., the hospital was concerned about DTs, and that they were available for consultation. Deputy Brooks noted in his report that when Officer Fouch told him about the hospital's concerns, he told the officer "We're the jail (meaning that we will have our medical see her)." Deputy Brooks asked Ms. Norman if she had been in the hospital in the last 24 hours for alcohol use. Despite wearing a hospital gown, she replied, "No." Deputy Brooks also asked Ms. Norman about alcohol withdrawal, and she said she was "starting to go through that now."

Page 10 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

34.     Deputy Brooks asked Yamhill County Sheriff's Office Sergeant Barbara Shipley
to pat down Ms. Norman. Sergeant Shipley documented that she was told that Ms. Norman "was
medically cleared by Newberg Hospital, and had a BAC of 0.25% at 2100 hours." Sergeant
Shipley performed the pat down and took Ms. Norman to the booking room. At that time, Ms.
Norman informed Sergeant Shipley she had gone through alcohol withdrawals before, had been
hospitalized for alcohol withdrawal on previous occasions, and was starting to DT. Sergeant
Shipley also noted in her report that she observed Ms. Norman starting to tremor.

35.     Sergeant Shipley and Deputy Brooks accepted custody of Ms. Norman without
having a member of the medical staff evaluate her.

36.     Yamhill County policy requires deputies to complete a medical screening form
for all people admitted to the jail. The jail file for Ms. Norman does not contain a medical
screening form. On information and belief, Sergeant Shipley and Deputy Brooks did not
complete a medical screening form for Ms. Norman.

37.     At approximately 10:56 p.m., Sergeant Shipley asked LPN Pena, to come to the
booking area to evaluate Ms. Norman for housing. Sergeant Shipley advised LPN Pena of Ms.
Norman's possible DTs, her BAC of 0.25% at 2100 hours, and provided her with the discharge
paperwork from Providence Newberg Hospital. The discharge paperwork did not list the dosages
of medications given and LPN Pena did not contact the hospital to obtain that information.

38.     LPN Pena was in the medical area for approximately three minutes during this
first visit. She did not physically examine Ms. Norman and did not take her vital signs. She
remained several feet from Ms. Norman at all times.

39.     At approximately 11:06 p.m., Sergeant Shipley requested LPN Pena return to
evaluate Ms. Norman for bleeding sores that went from her mid-thigh to above her belly button.

Ms. Norman let them know that the sores were from sitting in her own urine. This was another

sign of a heavy drinker and someone likely to detox. LPN Pena said she would advise the doctor

of the sores.

40.    LPN Pena left the booking area to call the on-call doctor, Hal Mitchell, DO, to

discuss a treatment plan for Ms. Norman. Dr. Mitchell ordered LPN Pena to withhold medication

and to begin the detox protocol the following morning due to his assumption of the amount of

medication Ms. Norman had been given in the hospital. This treatment plan was made without

knowing the amounts of dosages provided at the hospital.

41.    Nurse Michael Petrasek, the Health Services Administrator, described the

Wellpath/CCS policy for people who are at risk for alcohol withdrawal in the Yamhill County

Jail as follows:

> Inmates who are at risk for withdrawal from alcohol are typically initially identified
> on intake by deputies, who in turn notify medical. Medical then staff [sic] does an
> Intake * * * and if there are concerns about the potential to withdraw from alcohol,
> the nurse puts them in medical and immediately notifies the on call MD. We do not
> utilize standing orders, each case is run by the on call provider. Inmates are
> monitored via CCTV in the medical unit, and physically checked a minimum of
> every eight hours, if they are stable. Unstable inmates are monitored more closely.
> The inmate is seen at the next clinic as needed, and clinic is run three times weekly.
> Inmates who are stable, are not put on a medical watch. If there are concerns, such
> as extreme vital signs, ataxia, confusion, ect. [sic], they are put on less than 15
> minute medical checks. All inmates are on CIWA checks until stable, and their
> scores are low for 72 hours, or as needed.

42.    At 11:12 p.m., LPN Pena returned to the booking area where Ms. Norman was

sitting. LPN Pena did not perform any physical examination, nor take Ms. Norman's vital signs,

nor complete any sort of alcohol detox/health history, or do a detox evaluation. She informed

Ms. Norman that she would not get any medication until the morning. LPN Pena advised that

Ms. Norman needed to be housed in a medical cell on a detox protocol.

Page 12 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
SUPPLEMENTAL STATE CLAIMS

43.     LPN Pena completed an Alcohol and Benzodiazepine Withdrawal Provider Order Sheet for Ms. Norman. The form indicates that Ms. Norman should be housed in the infirmary/medical housing unit and should receive Librium every eight hours. Librium is used to reduce the impact of alcohol withdrawal. The form also includes a place for a nurse to record at what frequency vital signs would be performed. LPN Pena did not indicate on the form she intended to return at any time to get vital signs or do a detoxification evaluation. LPN Pena also never educated Ms. Norman on signs of withdrawal and when to report to health care staff or an officer. LPN Pena signed this form for herself and Doctor Mitchell at 10:45 p.m. despite the fact that she did not call Doctor Mitchell until 11:06 p.m.

44.     Wellpath/CCS had a document entitled "CIWA-Ar SCORE SHEET Alcohol and Benzodiazepine Withdrawal." The Wellpath/CCS file for Ms. Norman does not contain a copy of this form. No one completed this form for Ms. Norman.

45.     At approximately 11:34 p.m., Ms. Norman was housed in the Med-D cell by Deputy Brooks.

46.     LPN Pena never checked on Ms. Norman after she was housed in the Med-D cell.

47.     The security video from inside Ms. Norman's cell shows she rolled off her bed and onto the floor at approximately 3:11 a.m. Ms. Norman remained on the floor undiscovered for 23 minutes.

48.     At approximately 3:34 a.m., Sergeant Shipley performed a security check in the medical housing area. She saw Ms. Norman lying on the floor of the Med-D cell. She was not able to arouse Ms. Norman and she was not able to find a pulse. She requested the medical staff respond to the cell. Sergeant Shipley noted Ms. Norman's "skin had a grayish tone" and she "noticed liquid on the floor and could smell the odor of urine."

49.     At approximately 3:35 a.m., LPN Pena arrived at the cell. She documented Ms. Norman "appeared blue" and "had no pulse or respirations." LPN Pena, Sergeant Shipley, and others began CPR.

50.     At approximately 3:43 a.m., medics from the McMinnville Fire Department arrived at the jail and transported Ms. Norman to Willamette Valley Medical Center.

51.     At approximately 4:24 a.m., Ms. Norman was declared dead at Willamette Valley Medical Center. The doctor who examined Ms. Norman at Willamette Valley Medical Center noted her "extremities were mottled on presentation, suggestive of a prolonged downtime."

52.     On January 16, 2018, Dr. Rebecca Millius performed an autopsy on Ms. Norman. Dr. Millius concluded Ms. Norman's cause of death was "complications of chronic beverage alcohol use."

53.     On January 18, 2018, the Yamhill County Sheriff's Office issued a press release regarding Ms. Norman's death. The press release stated Ms. Norman "suffered a medical emergency due to an underlying medical condition and was transported to the Willamette Valley Medical Center. Despite lifesaving procedures, hospital staff were unable to resuscitate her." The press release also stated "[d]ue to her medical condition, she was placed in the medical unit. She was examined by the nurse of the jail's medical contractor, Correct Care Solutions."

54.     The January 18, 2018 press release did not mention that Ms. Norman had been transferred from a hospital, where she was being treated for alcohol intoxication. The January 18, 2018 press release did not mention Ms. Norman did not receive any treatment for alcohol withdrawal in the Yamhill County Jail. The January 18, 2018 press release did not mention the "nurse of the jail's medical contractor" was a licensed practical nurse, not a registered nurse. The January 18, 2018 press release did not mention the nurse did not take Ms. Norman's vital

Page 14 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

signs, did not get a detox or health history, and did not perform a proper medical evaluation.

55.     Alcohol withdrawal syndrome can be treated with medication and fluids. If Ms. Norman had received proper treatment for alcohol withdrawal syndrome while at the Yamhill County Jail or if she had been sent back to the hospital, she would have received treatment for alcohol withdrawal syndrome and would have survived.

56.     No one was disciplined or terminated for their treatment of Ms. Norman.

## YAMHILL COUNTY'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF JAIL INMATES

57.     In May 2015, Jed Hawk Myers died in the Yamhill County Jail.  Mr. Myers was moved to a cell in the medical housing unit after suffering serious injuries from being assaulted by two other inmates.  He was evaluated by an unqualified Med Tech who failed to take any vital signs. Mr. Myers was in visible distress and rang an intercom for help 19 times. He urinated blood in the toilet inside his cell. The jail deputies observed the distress and bloody urine, but never passed this information to the Med Tech on staff, and did nothing to help Mr. Myers. Mr. Myers spent over five hours in his cell before dying. It was only when he had slumped down onto the floor and stopped breathing that he received any direct medical attention.

58.     On June 22 2015, Yamhill County received an independent review from both the Lincoln County and Multnomah County Sheriff's Departments. That review stated that the Yamhill County Jail was too dependent on video monitoring and recommended that the medical housing area have physical/visual rounds conducted in the medical housing every 30 minutes at irregular intervals. On November 3, 2015, Sergeant Woody Little wrote a response to the independent review ignoring the suggestion for rounds of the medical housing area to be completed at a minimum of every 30 minutes.

59.    On October 12, 2016, Debbie Kocan-Samples was arrested on a warrant but taken to Willamette Valley Medical Center due to intoxication. While at WVMC, Ms. Kocan-Samples was also interviewed by a community health specialist who diagnosed her as suicidal and told the transporting deputy to put her on suicide watch. The transporting deputy relayed to the intake deputy that she was both suicidal and would detox. The suicide information was not passed down to other deputies. A sergeant decided to not place her on suicide watch despite the advice and diagnosis from the mental health professional. Ms. Kocan-Samples was moved into a cell monitored by a camera. Despite being in a camera cell, she was not sufficiently monitored and died from suicide shortly after. Ms. Kocan-Samples case was settled for $1,000,000.00 in 2017.

60.    In July 2017, Yamhill County paid $5,000,000 to settle a lawsuit filed by the Estate of Jed Hawk Myers. Yamhill County Sheriff Tim Svenson issued a statement about the lawsuit and settlement. Sheriff Svenson said that "I can * ** assure you, our citizens, that we continue to make our jail a more secure, attentive facility to all who are confined here, whatever the reason. It is important to understand that I hold all my staff to a high standard and expect professionalism and compassion to be an important presence in their daily duties." Ms. Norman died in the same medical housing unit six months later.

61.    Sheriff Tim Svenson wrote an article published in the Yamhill County News Register on August 25, 2017, titled *Tim Svenson: Moving the Office Forward*. In this article Sheriff Svenson took responsibility for the mistakes made by his office and promised to make things better. Including a "thorough review of jail procedures and policies with a critical eye to identifying areas for improvement that will ensure greater inmates safety." He also stated he had "Implemented procedural improvements designed to assist jail personnel with triaging inmates both for physical and mental health issues." He stated he would initiate an outside review of all

Page 16 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

jail operations to identify areas for improvement, to adopt best practices in all aspects of jail

operations and make it available to the public available to all citizens. The editorial goes on to

say that he would develop a Citizens' Advisory Board to seek counsel and encourage advise and

maters of concern. Finally, he promised to "stand up and own up when mistakes are made" and

demand the highest levels of professionalism from all those under his command. Less than five

months later, Ms. Norman was locked in a medical cell, received no treatment, and was allowed

to die while in custody of the facility Sheriff Svenson presides over.

62.    On January 23, 2018, Sheriff Tim Svenson was quoted in an article published in

the Yamhill County News Register. This article was titled "Woman dies following medical

emergency in the jail" The subject of the article was Kathleen Norman's death on January 15. In

that article Sheriff Svenson ratified the behavior of the Yamhill County Jail staff by saying

"…there is "zero indication" the staff was negligent in any way." "Staff did everything they

could, they followed policies and reacted as appropriately as they could." In this same article he

also ratified the actions of the Wellpath/CCS staff by stating, "The contractor is doing a great

job."

### FIRST CLAIM FOR RELIEF: Delay and Denial of Essential Medical Care

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983

63.    Plaintiff realleges and incorporates, as though fully set forth herein, all previous

paragraphs above.

64.    As a pretrial detainee, Kathleen Norman was entitled to due process and to be free

from cruel and unusual punishment pursuant to the Eighth and/or Fourteenth Amendments to the

United States Constitution. The prohibitions against cruel and unusual punishment apply to jail

conditions and specifically medical care.

Page 17 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
SUPPLEMENTAL STATE CLAIMS

65.     The acts and omissions of all defendants deprived Ms. Norman of her due process rights and subjected Ms. Norman to cruel and unusual punishment in violation of the Eighth Amendment and/or Fourteenth Amendments to the United States Constitution by amounting to deliberate indifference to Ms. Norman's serious medical needs and personal safety. Defendants violated the requirements of the Eighth and/or Fourteenth Amendments in the provision of medical care by causing undue delay and denial of medically necessary treatment for Ms. Norman's condition.

66.     Defendants Pena, Mitchell, Brooks and Shipley were deliberately indifferent to Ms. Norman's rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

a.     In failing to reject Kathleen Norman for admission to the Yamhill County Jail;

b.     In failing to properly screen Kathleen Norman before she was admitted to the Yamhill County Jail;

c.     In failing to provide Kathleen Norman with proper and competent medical treatment for her serious medical condition;

d.     In failing to respond properly to the fact that Kathleen Norman was withdrawing from alcohol;

e.     In failing to recognize Kathleen Norman was not medically stable;

f.     In failing to ensure the nurse did a proper intake assessment;

g.     In failing to ensure that Kathleen Norman was examined by qualified medical personnel once she was admitted to the Yamhill County Jail;

h.     In failing to continue Kathleen Norman's alcohol withdrawal treatment;

i.     In failing to transfer Kathleen Norman to a hospital for treatment of her serious

medical needs;

j.      In failing to get vital signs;

k.      In failing to contact the hospital to find out dose amounts of medications

        Kathleen. Norman had received;

l.      In failing to contact the hospital to find out important and available medical

        information that was necessary to create a safe medical treatment plan; including

        Kathleen Norman's history of alcohol withdrawal; the existence of previous

        withdrawals accompanied by seizures; and her extraordinarily high alcohol BAC

        she presented at the hospital.

m.      In deciding to withhold life-saving withdrawal mediation;

n.      In accepting custody of Kathleen Norman without having a medical provider that

        had the resources to properly treat and monitor her;

o.      In ignoring the advice and concerns of the Emergency Room physician and staff

        that Kathleen Norman was likely to detox while in custody;

p       In failing to closely monitor Kathleen Norman;

q.      In failing to check on Kathleen Norman in less than 30 minute increments;

r.      In relying on jail deputies to medically monitor Kathleen Norman during routine

        security checks;

s.      In failing to provide the on-call provider with all the necessary information to

        make a medically informed treatment plan;

t.      In making medical decisions without insisting on a CIWA;

u.      In failing to perform a medically indicated CIWA assessment to measure

        Kathleen Norman's risk for a dangerous alcohol withdrawal episode.

Page 19 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
SUPPLEMENTAL STATE CLAIMS

u.     In making medical decisions without obtaining a medical history;

v.     In making medical decisions without insisting on getting vital signs;

w.     In making medical decisions without knowing the patients medication history;

x.     In failing to insist Wellpath/CCS evaluate, monitor, and treat Kathleen Norman;

y.     In failing to enter her cell until Kathleen Norman was lying on the floor not breathing;

z.     In failing to coordinate care between medical providers and jail staff;

aa.    In failing to properly supervise the Licensed Practical Nurse.

bb.    In failing to educate the patient of signs of withdrawal and when to report to health care staff or jail staff;

cc.    In failing to have any written plan to follow up to get vital signs;

dd.    In failing to timely discover that Kathleen Norman experienced a medical emergency when she fell off her sleeping platform; and

67.    As a direct result of the actions and inactions of defendants as set forth in paragraphs 1-66, above, Kathleen Norman endured and suffered severe physical distress, her medical condition was exacerbated, and she died of alcohol withdrawal. Ms. Norman's mother, the beneficiary of the estate, has been denied her love, society, and companionship. Ms. Norman's estate incurred medical expenses and funeral expenses. Ms. Norman's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

68.    The actions of defendants Pena, Mitchell, Brooks, and Shipley were recklessly indifferent to the civil rights of Kathleen Norman, and callously Ms.Norman's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

69.     Plaintiff is entitled to his necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## SECOND CLAIM FOR RELIEF:

### *Monell* Claims

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983

(Yamhill County and Wellpath/CCS)

70.     Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

71.     Defendant Yamhill County is a municipal corporation created under the laws of the State of Oregon. Yamhill County is a "person" under 42 U.S.C. 1983.

72.     Defendants Yamhill County and Wellpath/CCS were deliberately indifferent to Kathleen Norman's serious medical needs and her rights under the Eighth and/or Fourteenth Amendments to the United States Constitution. The moving forces that resulted in the deprivation of the Eighth and/or Fourteenth Amendment rights of Ms. Norman were the following policies, customs or practices of Yamhill County and Wellpath/CCS:

a.     A policy, custom or practice of accepting detainees into custody without the ability to provide adequate medical care;

b.     A policy custom or practice of relying on jail staff not adequately trained for medical monitoring;

c.     A policy custom or practice of failing to share vital detainee medical information between Yamhill County Jail staff and Wellpath/CCS employees;

d.     A policy, custom or practice of not properly screening people before accepting them into the Yamhill County Jail;

Page 21 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

e.      A policy, custom or practice of arbitrarily relying on/requiring a BAC of .25 or less as a criterion for accepting an intoxicated arrestee into custody into the Yamhill County Jail;

f.      A policy, custom or practice of providing insufficient medical personnel coverage at the Yamhill County Jail;

g.      A policy, custom or practice of hiring personnel indifferent to the medical needs of inmates at the Yamhill County Jail;

h.      A policy, custom or practice of staffing LPNs instead of RNs to provide inmate medical care;

i.      A policy, custom or practice of in failing to adequately supervise LPNs;

j.      A policy, custom or practice of denying inmates medically necessary transfers to hospitals;

k.      A policy, custom or practice of failing to ensure employees of Yamhill County and Wellpath/CCS had proper training in screening people for medical problems at or near the time of booking into the jail;

l.      A policy, custom or practice of failing to ensure that employees of Yamhill County and Wellpath/CCS had proper training in responding to the serious medical needs of inmates;

m.      A policy, custom or practice of failing to ensure that employees of Yamhill County and Wellpath/CCS had proper training in responding to an inmate experiencing alcohol withdrawal;

n.      A policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical services for jail inmates;

o.      A policy, custom or practice of allowing Licensed Practical Nurses to call an on-call provider without essential information needed to make medical decisions;

p.      A policy, custom or practice of allowing on-call doctors make critical medical decisions without essential patient information;

q.      In failing to properly train non-medical staff on the proper way to supervise medical care provided by Wellpath/CCS employees;

r.      In failing to properly train jail staff on evaluating detoxing inmates;

s.      In failing to properly train jail staff on how to medically monitor inmates detoxing from alcohol;

t.      In failing to properly train jail staff on how to coordinate medical monitoring with contracted medical staff;

u.      In failing to properly train jail staff on completing a proper intake of a detainee being transferred from a hospital;

v.      In failing to properly train Wellpath/CCS employees on the jail policies and practices;

w.      In failing to have clear hiring criteria to ensure qualified medical providers are retained;

x.      In failing to adequately train medical providers and nursing staff;

y.      In failing to adequately evaluate the abilities and training of nurses and Licensed Independent Practitioners;

z.      In failing to properly train medical staff to get vital signs;

aa.    In failing to properly train medical staff to complete a CIWA;

bb.    In failing to require medical staff to use CIWA or other validated and accepted

Page 23 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

clinical assessment tool to evaluate inmates suspected of experiencing alcohol withdrawal;

cc.  In failing to properly train medical staff to get all of the medical information before making medical decisions;

dd.  In failing to properly train medical staff to contact a transferring institution to obtain medical information needed to make medical decisions;

ee.  A policy, custom and practice of allowing licensed practical nurse to have discretion on whether to take vital signs from a detainee detoxing from alcohol; and

ff.  In failing to properly train on-call medical providers to insist on getting all the essential information before making medical decisions.

73.  The policies of defendants Wellpath/CCS and Yamhill County posed a substantial risk of causing substantial harm to Yamhill County inmates, and Wellpath/CCS and Yamhill County were aware of the risk.

74.  As a direct result of the policies, customs or practices of Wellpath/CCS and Yamhill County set for in paragraphs 70-73, Kathleen Norman was not provided with timely medical care. As a direct result of the policies, customs or practices of Wellpath/CCS and Yamhill County, Ms. Norman endured and suffered severe physical distress, her medical condition was exacerbated, and she died of alcohol withdrawal. Ms. Norman's mother has been denied her love, society, and companionship. Ms. Norman's estate incurred medical expenses and funeral expenses. Ms. Norman's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

Page 24 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

75.     The actions of defendant Wellpath/CCS were recklessly indifferent to the civil rights of Ms. Norman, and callously disregarded Ms. Norman's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

76.     Plaintiff is entitled to his necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## THIRD CLAIM FOR RELIEF

### Supervisor Liability

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983

77.     Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

78.     Defendants Mitchell, and Petrasek were supervisors of Wellpath employees at the time of the events alleged herein, and defendants Svenson and Ruby were supervisors of Yamhill County Jail employees. The defendant supervisors oversaw the operations of Wellpath and Yamhill County Jail respectively, and had a duty to ensure subordinate staff followed all applicable policies, rules, medical standards, and legal parameters, as well as a duty to change or update policies when changes were necessary. The defendant supervisors failed to adequately and constitutionally train and supervise the subordinate staff. As a result of the failure to supervise, the supervisory defendants were deliberately indifferent to Kathleen Norman's serious medical needs and her rights under the Eighth and/or Fourteenth Amendments of the United States Constitution in one or more of the following particulars:

a.     In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had proper training in responding to the serious medical needs of jail inmates;

b.     In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had

Page 25 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

proper training in responding to an inmate experiencing alcohol withdrawal;

c.      In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had

proper training in the screening of people being admitted to the Yamhill County

Jail;

d.      In staffing unsupervised LPNs to provide inmate medical care;

e.      In failing to require Wellpath/CCS staff to contact the ER for medication dosage

received by transferring patient;

f.      In failing to require that Yamhill County Jail staff and Wellpath/CCS staff

provide effective close medical monitoring of patients experiencing alcohol

withdrawal;

g.      In failing to coordinate monitoring between jail staff and Wellpath/CCS staff;

h.      In failing to make sure information passed from the emergency room providers is

shared between jail staff and Wellpath/CCS staff;

i       In creating a practice in which jail staff acquiesces its duty to supervise and

provide medical care to detainees;

j.      In failing to hire medical staff experienced and trained in detoxification;

k.      In failing to discipline LPN Pena and Dr. Mitchell for not providing medical care;

and

l.      In failing to discipline Sergeant Brooks and Sergeant Shipley for not coordinating

and making sure medical was providing adequate medical care to Ms. Norman.

79.      As a direct result of the actions and inactions of defendants as set forth in

paragraphs 77 and 78 above, Kathleen Norman endured and suffered severe physical distress, her

medical condition was exacerbated, and she died of alcohol withdrawal. Ms. Norman's mother,

Page 26 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND
SUPPLEMENTAL STATE CLAIMS

the beneficiary of the estate, has been denied her love, society, and companionship. Ms. Norman's estate incurred medical expenses and funeral expenses. Ms. Norman's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

80.    The actions of defendants Mitchell, Petrasek, Svenson, and Ruby were recklessly indifferent to the civil rights of Kathleen Norman, and callously disregarded Ms. Norman's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

81.    Plaintiff is entitled to his necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## FOURTH CLAIM FOR RELIEF:

### Negligence

82.    Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

83.    The actions of defendants Yamhill County and Wellpath/CCS, acting by and through their employees and agents, were negligent in one or more of the following particulars:

a.    In failing to reject Kathleen Norman for admission into the Yamhill County Jail;

b.    In failing to properly screen Kathleen Norman before she was admitted to the Yamhill County Jail;

c.    In failing to provide Kathleen Norman with proper medical treatment for her serious medical condition;

d.    In failing to respond properly to the fact that Kathleen Norman was withdrawing from alcohol;

e.    In staffing LPN's instead of RNs to provide inmate medical care;

f.      In failing to adequately staff medical personnel at night;

g.      In failing to adequately supervise LPN's;

h.      In failing to ensure the nurse did a proper examination;

i.      In failing to ensure Kathleen Norman was examined by qualified medical personnel once she was admitted to the Yamhill County Jail;

j.      In failing to provide Kathleen Norman's alcohol withdrawal treatment;

k.      In failing to transfer Kathleen Norman to a hospital for treatment of her serious medical condition;

l.      In failing to ensure that employees of the Yamhill County Jail and Wellpath/CCS had proper training in responding to the serious medical needs of jail inmates;

m.      In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had proper training in responding to an inmate experiencing alcohol withdrawal;

n.      In failing to locate medical staff to speak with hospital staff calling to discuss potential transferring patient;

o.      In failing to closely monitor detainee experiencing alcohol withdrawal;

p.      In failing to relay concerns called in by a treating hospital provider to remaining jail and medical staff;

q.      In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had proper training in the screening of people being admitted to the Yamhill County Jail; and

84.      As a direct result of the actions and inactions of defendants, and each of them, Kathleen Norman endured and suffered severe physical distress, her medical condition was exacerbated, and she died of alcohol withdrawal. Ms. Norman's mother has been denied her

Page 28 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

love, society, and companionship. Ms. Norman's estate incurred medical expenses and funeral expenses. Ms. Norman's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

85.    Notice pursuant to the Oregon Tort Claims Act was given to defendant Yamhill County within the time prescribed by law.

## FIFTH CLAIM FOR RELIEF

### Gross Negligence/Reckless Misconduct

86.    Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

87.    Defendant Wellpath/CCS, by and through its employees acting within the scope of their employment, was grossly negligent and acted with reckless misconduct in one or more of the following particulars:

a.    In failing to reject Kathleen Norman for admission into the Yamhill County Jail;

b.    In failing to properly screen Kathleen Norman before she was admitted to the Yamhill County Jail;

c.    In failing to provide Kathleen Norman with proper medical treatment for her serious medical condition;

d.    In failing to respond properly to the fact that Kathleen Norman was withdrawing from alcohol;

e.    In failing to ensure the nurse did a proper exam;

f.    In failing to ensure Kathleen Norman was examined by qualified personnel once she was admitted to the Yamhill County Jail;

g.    In failing to continue Kathleen Norman's alcohol withdrawal treatment;

Page 29 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

h.      In failing to transfer Kathleen Norman to a hospital for treatment of her serious medical needs;

i.      In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had proper training in responding to the serious medical needs of jail inmates;

j.      In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had proper training in responding to an inmate experiencing alcohol withdrawal;

k.      In failing to ensure employees of the Yamhill County Jail and Wellpath/CCS had proper training in the screening of people being admitted to the Yamhill County Jail;

l.      In staffing LPNs instead of RNs to provide inmate medical care; and

m.      In failing to adequately supervise LPNs' and

n.      In permitting LPN's to make medical decisions like when to take vital signs, perform CIWA, and medically monitor detainees detoxing from alcohol.

88.      As a direct result of the misconduct of defendant Wellpath/CCS, Kathleen Norman endured and suffered severe physical distress, her medical condition was exacerbated, and she died of alcohol withdrawal. Ms. Norman's mother, the beneficiary of the estate, has been denied her love, society, and companionship. Ms. Norman's estate incurred medical expenses and funeral expenses. Ms. Norman's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

89.      The actions of defendant Wellpath/CCS were grossly negligent, were recklessly indifferent to the civil rights of Kathleen Norman, and callously disregarded Ms. Norman's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

Page 30 – SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPLEMENTAL STATE CLAIMS

WHEREFORE, Plaintiff prays for judgment as follows:

**On the First Claim for Relief**, for judgment against defendants Pena, Mitchell, Brooks, Shipley, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages in whatever amount the jury concludes is appropriate and for necessarily and reasonably incurred attorney fees and costs;

**On the Second Claim for Relief**, for judgment against defendants Wellpath/CCS and Yamhill County, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages against defendant Wellpath/CCS in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

**On the Third Claim for Relief**, for judgment against defendants Mitchell, Petracek, Svenson, and Ruby, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages against defendants Mitchell, Petracek, Svenson, and Ruby in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

**On the Fourth Claim for Relief,** for judgment against defendants Wellpath/CCS and Yamhill County, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages against defendant Wellpath/CCS in whatever amount the jury concludes is appropriate;

**On the Fifth Claim for Relief,** for judgment against defendants Wellpath/CCS and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs;

**PLAINTIFF DEMANDS A JURY TRIAL.**

DATED this 21st day of March, 2022.

> **Matthew Kaplan**, OSB No. 980699
> KAPLAN LAW LLC
> 50 SW Pine Street Ste. 302
> Portland, OR 97204
> Phone: (503) 226-3844
> Facsimile: (503) 943-6670
> matthew@mdkaplanlaw.com
>
> **Patrick Angel,** OSB No. 032672
> ANGEL LAW PC
> 3 Centerpointe Drive
> Lake Oswego, OR 97035
> Phone: (503) 953-8224
> Facsimile: (503) 828-9841
> patrick@angellawpc.com
>
> /s/ Nadia H. Dahab
> **Nadia Dahab**, OSB 125630
> SUGERMAN DAHAB
> 707 SW Washington Street Ste. 600
> Portland, OR 97205
> Phone: (503) 228-6474
> nadia@sugermandahab.com