IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**GUY RAY NORMAN**, Personal
Representative for the Estate of Kathleen
Margaret Norman, Deceased,

               Plaintiff,

      v.

**WELLPATH, LLC**, a Delaware
corporation, **et al.**,

             Defendants.

Case No. 3:19-cv-02095-MO

OPINION & ORDER

**MOSMAN, J.**,

      This case arises from the death of Kathleen Norman while in custody in Yamhill County
Jail. Plaintiff Guy Ray Norman, the personal representative of Ms. Norman's estate, contends
that her death is the result of indifferent policies and actions from those that had an obligation to
monitor and care for her. These defendants may be split into four sets: (1) Yamhill County, the
operator of the jail in which Ms. Norman died; (2) Wellpath, LLC, the health care provider for
the jail; (3) employees of Yamhill County; and (4) employees of Wellpath. Each set of
defendants has filed a separate motion for summary judgment. Asserting their policies were
reasonable and that their employees followed those policies, Defendants characterize Ms.
Norman's death as an "unexpected turn for the worse." Indiv. Wellpath Defs.' Mot. for Summ. J.
[ECF 153] at 6. I find that some of Norman's claims are based in genuine disputes of material

fact and that others are not. Accordingly, I grant the Individual County Defendants' motion and grant in part and deny in part the other three motions.

## BACKGROUND

On January 14, 2018, one of Ms. Norman's relatives notified the police that Ms. Norman was at her home and had an outstanding arrest warrant for a misdemeanor DUII charge. Second Am. Compl. [ECF 171] ¶ 24. Ms. Norman had a history of heavy drinking followed by severe alcohol withdrawal; the relative hoped that arresting Ms. Norman would allow her to get needed medical assistance and safely detox. *Id.* Shortly thereafter, a police officer and paramedics arrived at Ms. Norman's home. *Id.* ¶ 25. The paramedics took Ms. Norman to the Providence Newberg Medical Center, where she was seen by a nurse practitioner. *Id.* ¶ 26. The nurse diagnosed Ms. Norman with acute alcohol intoxication; her blood alcohol content (BAC) was .522—six and a half times the legal limit of .08. *Id.* ¶ 26.

Ms. Norman was treated for roughly eight hours. *Id.* ¶ 1. At around 9:00 p.m., a nurse at the medical center called the Newberg-Dundee Police Department to report that Ms. Norman was medically cleared and could be taken into custody. *Id.* ¶ 30. Another nurse checked with the police department to ensure the Yamhill County Jail could care for detoxing inmates. Kaplan Decl. [ECF 164] Ex. 62 at 5:12–25. The officer with whom she spoke said that it could. *Id.* at 6:15–17.

Officer Daniel Fouch arrived at the medical center to take Ms. Norman to jail. *Id.* Ex. 28. at 1. While at the medical center, Officer Fouch heard medical personnel express concern that Ms. Norman would experience delirium tremens (DT), a severe form of alcohol withdrawal. *Id.* at 2. Officer Fouch noted that Ms. Norman had difficulty balancing. *Id.* Upon arriving at the jail, Officer Fouch explained to the booking deputy, Michael Brooks, "that the hospital was

concerned with DT's and that they were available for contact." *Id.* Dep. Brooks asked Ms.

Norman about whether she had been going through withdrawals; Ms. Norman reportedly said

she had "gone through alcohol withdrawals before and that she was starting to DT at that time."

*Id.* Ex. 30. During the initial booking process, Officer Fouch steadied Ms. Norman's balance and

helped her walk. Video Exs. [ECF 168] Exs. 7–9.

A licensed practical nurse (LPN), Darla Pena, arrived and reviewed Ms. Norman's

hospital discharge paperwork. Kaplan Decl. [ECF 164] Ex. 30. Nurse Pena was employed by

Wellpath, the County's health care provider. Nurse Pena asked Ms. Norman if she could assess

her vitals, to which Ms. Norman responded "No, I'm too tired." Gardner Decl. [ECF 176] Ex. T

at 10:5–10. Nurse Pena then left to ask the on-call doctor, Dr. Hal Mitchell, about the jail's

protocol for DT. Kaplan Decl. [ECF 164] Ex. 30. Dr. Mitchell, also a Wellpath employee,

instructed Nurse Pena to wait until morning "because of the amount of medication" Ms. Norman

had received at the hospital. Kaplan Decl. [ECF 164] Ex. 57 at 8:1–2. Deposition testimony

indicates that, at the time, neither Nurse Pena nor Dr. Mitchell knew how much medication Ms.

Norman had actually received. *Id.* at 8:4–7. Nurse Pena informed Dr. Mitchell that Ms. Norman

had refused a medical assessment, but he did not instruct her to take any action in response.

Gardner Decl. [ECF 176] Ex. T at 12:25–13:17.

While Nurse Pena was on the phone with Dr. Mitchell, jail staff conducted a body search

of Ms. Norman. They found bleeding and clotted sores from her mid-thigh to her torso. Kaplan

Decl. [ECF 164] Ex. 30. Ms. Norman stated that the sores were from "sitting in [her] own urine."

*Id.* Sgt. Barbara Shipley, the shift supervisor, asked Nurse Pena to take another look at Ms.

Norman. *Id.*

Nurse Pena returned and advised that Ms. Norman be housed in a medical cell on a detoxification protocol. *Id.* Ex. 30. Corrections staff checked on Ms. Norman six times over the course of the night at roughly 45-minute intervals. Ruby Decl. [ECF 150] Ex. C at 1. These checks were done on the outside of Ms. Norman's cell, without entering. *See* Video Exs. [ECF 168] Ex. 20. At the same time, a deputy in the jail's communications control room was on duty to monitor inmates through in-cell security cameras. Smith Decl. [ECF 151] Ex. F at 4:4–10. At around 2:03 a.m., Ms. Norman got up and used the toilet, possibly to vomit. Video Exs. [ECF 168] Ex. 20 at 2:25:18–52. After using the toilet, she stumbled back to bed and fell asleep. *Id.* 2:27:20–28:48.

An hour later, Ms. Norman rolled off her bed, landing face-down on the floor. *Id.* 3:37:00–10. For 20 minutes, Ms. Norman was alone on the ground. *Id.* 3:37:10–57:14. Eventually, she was found by Sergeant Barbara Shipley, who quickly went to get Nurse Pena. *Id.* 3:57:10–14. In an awkward shuffle, the two returned together, and then both left again to get medical supplies. *Id.* 3:57:14–58:20. Almost two minutes after discovering Ms. Norman, Sgt. Shipley re-entered the room and began to administer CPR. *Id.* 3:57:14–59:15. Paramedics arrived shortly thereafter, but their attempts to resuscitate Ms. Norman were unsuccessful. A medical examiner attributed Ms. Norman's death to "complications of chronic beverage alcohol use." Gardner Decl. [ECF 176] Ex. R at 1.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

The moving party bears the initial burden of informing the court of the basis of its motion and providing evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the nonmoving party must "present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (internal quotation omitted). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## DISCUSSION

Norman brings five claims: (1) a § 1983 claim for delay and denial of essential medical care against Defendants Nurse Pena, Dr. Mitchell, Dep. Brooks, and Sgt. Shipley; (2) a § 1983 *Monell* claim against Yamhill County and Wellpath; (3) a § 1983 claim against Defendants Dr. Mitchell, Michael Petrasek, Tim Svenson, and Jeremy Ruby; (4) a negligence claim against Yamhill County and Wellpath; and (5) a gross negligence claim against Wellpath. Second Am. Compl. [ECF 171] ¶¶ 63–89. But first, I address the Defendants' related motion to strike.

### I.    Motion to Strike

In their reply in support of their motion for summary judgment, the Individual Wellpath Defendants moved to exclude some of Norman's exhibits and expert reports. Indiv. Wellpath Defs.' Reply [ECF 173] at 13–23. Other defendants joined the motion in support. *See id.* at 14. I discussed and ruled on this motion at oral argument, granting and denying in part. Tr. of Oral Arg. [ECF 191] at 3:21–14:24. Those rulings are solely for the purposes of this motion. They do

not dictate whether evidence will be admitted or excluded at trial. For the reader to know what evidence I do and do not rely on in this opinion, I summarize my rulings on the motion to strike as follows:

- The Mortality & Morbidity Report & Review, Kaplan Decl. [ECF 164] Ex. 74, is stricken;

- Evidence associated with the deaths of Jed Hawk Myers and Debbie Kocan Samples is permitted;

- A demand letter sent by counsel for the Estate of Jed Hawk Myers to the City County Insurance Services, Kaplan Decl. [ECF 164] Ex. 43, is stricken;

- The City Count Insurance Services audit of the jail, Kaplan Decl. [ECF 164] Ex. 35, is stricken;

- The Freeman Report, Kaplan Decl. [ECF 164] Ex. 65, is permitted to the extent that it summarizes general epidemiological studies; it is stricken to the extent that it applies those studies to Ms. Norman's specific circumstances;

- The Stanley Report, Kaplan Decl. [ECF 164] Ex. 75, is permitted, with the exception of its comment that Wellpath provided inadequate training to jail staff; and

- The Powers Report, Kaplan Decl. [ECF 164] Ex. 67, is permitted.

## II.    Yamhill County's Motion for Summary Judgment

Yamhill County moves for summary judgment on both Norman's *Monell* and negligence claims against it.

### A. *Monell* Claim

In *Monell v. Department of Social Services.*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipal entities may be sued for money damages under 42 U.S.C. § 1983 when their policies result in the deprivation of constitutional rights. Pretrial detainees—like Ms. Norman—have a right to receive adequate medical care under the Fourteenth Amendment. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021). A municipal entity violates

this right when it has a "'policy or custom'" that injures a detainee "through deliberate indifference to [the detainee's] constitutional right to adequate medical care." *Id.* at 681.

A *Monell* plaintiff may establish objective indifference by showing the municipal entity "had actual or constructive knowledge" that its policies were "'substantially certain' to result in inmates failing to receive the proper treatment, creating a likelihood of serious injury or death." *Id.* at 682–83 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016)). Moreover, the plaintiff must identify "a direct causal link" between the policy and question and the constitutional deprivation the plaintiff alleges. *Castro*, 833 F.3d at 1075.

A plaintiff may demonstrate the existence of a policy giving rise to *Monell* liability in three different ways. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992), *abrogation on other grounds recognized by Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021). The simplest way is to show the existence of a "formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Id.* (internal quotation marks omitted). A plaintiff may also point to an act committed by "an official with final policy-making authority," thus making the action itself "an act of official governmental policy." *Id.* (internal quotation marks omitted). Lastly, when an official with final policy-making authority "ratifie[s] a subordinate's unconstitutional decision or action and the basis for it," the subordinate's decision or action becomes a policy for *Monell* purposes. *Id.*

Norman contends that the County had seven policies that now give rise to *Monell* liability. I address each in turn.

### 1.  Failing to Adequately Monitor Detainees in Medical Cells

As a preliminary matter, the County objects to this claim on the ground that it is not in Norman's complaint. Yamhill Cnty. Reply [ECF 174] at 4–5. This is technically true—the

complaint does not explicitly allege that the County had a policy of inadequately monitoring detainees. However, the complaint makes two closely-related allegations: that the County had a policy of "relying on jail staff not adequately trained for medical monitoring" and a policy of "failing to properly train jail staff on how to medically monitor inmates detoxing from alcohol." Second Am. Compl. [ECF 171] ¶ 72(b), (s). The parties have engaged in extensive discovery regarding the County's monitoring policies, and the County appears to have no difficulty responding to the claim on summary judgment. *See* Yamhill Cnty. Reply [ECF 174] at 7–12. In fact, the County does not allege any prejudice in having to respond to this claim. *See id.* at 5–7.

Moreover, though the complaint does not frame a failure to monitor as a claim, it does make factual allegations describing the policy and how it was implemented in relation to Ms. Norman. Second Am. Compl. [ECF 171] ¶¶ 41–49; *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (refusing to hear a claim because the complaint did "not include the necessary *factual allegations* to state a claim") (emphasis added). Accordingly, I consider this claim here.

### i.    Defining the Policy

In their briefing, the parties pointed to several policies that appear to run contrary to each other. *Compare* Resp. to Yamhill Cnty. Mot. [ECF 159] at 24–26 *with* Yamhill Cnty. Reply [ECF 174] at 8. One policy required detoxing inmates to be checked every 15 minutes; another required hourly checks; and another set a more subjective standard. *See* Kaplan Decl. [ECF 164] Ex. 25 at 3–4 (15-minute watch for those detoxing); *id.* Ex. 11 (setting three levels of supervision, ranging from hourly checks to 15-minute checks) *id.* Ex. 13 (hourly checks "unless the situation warrants closer observation"); *id.* Ex. 15 at 2 (those who are detoxing should be "closely monitored"). At oral argument, the parties agreed that the County's actual practice is to

put inmates on an hourly watch, but that medical staff may recommend more frequent monitoring. Tr. of Oral Arg. [ECF 191] at 16:13–18:5, 19:13–17.

Because the County's policy gives significant deference to monitoring decisions made by Wellpath employees, Wellpath's monitoring policy is relevant, too. Wellpath policy bases its monitoring schedule on the results of a medical screening required for all detainees. This screening is to occur "as soon as possible after the [detainee's] booking into the Jail, not to exceed 24 hours after the [detainee's] arrival at the Jail." Kaplan Decl. [ECF 164] Ex. 1 at 2; *see also* Tr. of Oral Arg. [ECF 191] at 37:3–5. Generally, this screening is conducted by a nurse. If the nurse believes the detainee is at risk of experiencing alcohol withdrawal, he consults with an on-site or on-call physician to make a treatment plan. Kaplan Decl. [ECF 164] Ex. 23 at 3. If medical staff finds that the detainee is stable, then the detainee is placed on an eight-hour watch. *Id.* Ex. 37 at 3. Unstable detainees are watched more closely; those with severe symptoms are placed on a 15-minute watch. *Id.*

### ii.    Deliberate Indifference

I now must determine whether the County's policy manifests deliberate indifference. If the policy merely required an hourly watch, then deliberate indifference would be clear. Dr. Robert Powers, one of Norman's medical experts, opines that an individual going through alcohol withdrawal should "be medically monitored every 15 or 30 minutes depending on symptoms." Kaplan Decl. [ECF 164] Ex. 67 at 6. Because inmates experiencing withdrawal "can and often do deteriorate rapidly," less frequent monitoring "can result in a medical emergency which can be fatal." *Id.* Accordingly, I find that a policy of placing detoxing inmates on an hourly watch—absent additional precautions—would be sufficiently dangerous to support a finding of deliberate indifference. *See Sandoval*, 985 F.3d at 668.

Furthermore, the County had notice that it needed to provide frequent medical monitoring for inmates at medical risk. In 2015, Jed Hawk Myers died in custody at the jail when he was placed on a 30-minute watch despite clear signs of alcohol withdrawal. Kaplan Decl. [ECF 164] Ex. 56 at 9:7–10. The following year, another inmate, Debbie Kocan-Samples, died in custody after a communications mix-up omitted her from the County's suicide watch. *Id.* at 14:22–15:16. If the County's sole monitoring policy was its default of hourly visual checks, then Norman could surely meet his burden at summary judgment to show that policy was deliberately indifferent.

However, the County's policy is not just hourly visual checks; it is hourly visual checks *unless* medical staff orders otherwise. Generally, a policy of deferring to medical experts does not demonstrate deliberate indifference. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1084 (9th Cir. 2013) (finding corrections officers "did not act with deliberate indifference" because they "reasonably relied on the expertise of the prison's medical staff"). Though medical experts may occasionally make mistakes, isolated errors are not policies for *Monell* purposes. *See Gillette*, 979 F.2d at 1346–47. For reliance on expert medical advice to give rise to *Monell* liability, the municipality must have constructive knowledge that the advice is formulated through a process that is indifferent to the needs of detainees. Deficient treatment must be more than the result of a nurse's faulty recommendation—it must be a "standard operating procedure of the local governmental entity." *Id.* at 1346 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

The crux of Norman's argument is that deference to Wellpath's policy is unreasonable because it allows medical staff—often an LPN—to make critical medical decisions with limited data and without making any kind of evidence-based assessment. Oral Arg. Tr. [ECF 191] at

42:6–12; *see also* Kaplan Decl. [ECF 164] Ex. 67 at 7–8 (explaining deficiencies in Wellpath's policy for detoxing inmates). Dr. Powers identifies the Clinical Institute Withdrawal Assessment (CIWA) as a readily available instrument that, if used, likely could have identified Ms. Norman's perilous condition. Kaplan Decl. [ECF 164] Ex. 67 at 7–8. Wellpath contends that, in practice, the administration of a CIWA is non-discretionary and that it must be administered within 24 hours of an inmate's arrival. Tr. of Oral Arg. [ECF 191] at 40:1–2.

Wellpath's defense highlights a deeper problem with its policy for treatment of alcohol withdrawal: it fails to account for detainees with urgent medical needs. Even when medical staff has reason to suspect detainees are at a significant medical risk, Wellpath policy allows medical staff to wait up to 24 hours before assessing them. Kaplan Decl. [ECF 164] Ex. 1 at 2 ("A receiving screening of a [detainee] shall be performed as soon as possible after the [detainee's] booking into the Jail, not to exceed 24 hours after the [detainee's] arrival at the jail); *id.* Ex 27 (discussing how two individuals "with very high BAC's" "and a history of medical issues" were detained without a watch being started); Oral Arg. Tr. [ECF 191] at 39:25–40:3 (stating that the "policy gave [Nurse Pena] 24 hours" to administer a CIWA).

That timeline is far too lax to effectively treat many life-threatening conditions. Symptoms of alcohol withdrawal—including seizures—generally occur within the first 6 hours following the patient's last drink and subside over the next couple days. Kaplan Decl. [ECF 164] Ex. 65 at 7. DT can set in within 48–96 hours after the last drink, increasing increases patients' risk of cardiac arrhythmia and sudden death. *Id.*

While they await their medical assessment, detainees are watched every hour. As discussed previously, such an infrequent watch places detoxing detainees at significant health

risks of which the County was aware. *See* Kaplan Decl. [ECF 164] Ex. 56 at 9:7–20 (discussing death of Jed Hawk Myers).

The County's policy of relying on medical staff is not reasonable when medical staff has not made an assessment. Given Wellpath's loose, 24-hour timeline, that assessment may come too late to adequately care for detainees with urgent medical conditions. Because the County's default hourly watch applies to detainees known to be experiencing alcohol withdrawal who have yet to receive any meaningful assessment from medical staff, I determine that a reasonable jury could find that the County's monitoring policy suggests deliberate indifference.

### iii.    Causal Link

The County asserts that even if its monitoring policy was deliberately indifferent, it does not give rise to *Monell* liability because Norman has failed to identify a causal link between the policy and Ms. Norman's death. Yamhill Cnty. Reply [ECF 174] at 12. Norman points to his expert report from Dr. Powers, which opines that the "lack of adequate monitoring resulted in an unnecessary prolonged delay in any medical intervention for Ms. Norman." Kaplan Decl. [ECF 164] Ex. 67 at 7. Continuing, Dr. Powers states that "[t]his delay was likely the difference between life and death" and that "[a]ny chance Ms. Norman[] had of a successful recovery from alcohol dependency was extinguished due to," among other factors, "a lack of medical monitoring." *Id.*

I find that Dr. Powers's opinion suffices to establish a causal link at summary judgment. It took the County over 20 minutes to discover that Ms. Norman had fallen from her bed; a closer watch would have discovered her earlier. With the aid of Dr. Powers's report, a jury could reasonably find that more timely aid could have saved Ms. Norman's life.

Having identified a policy, evidence indicating that the policy showed deliberate indifference, and a causal link between the policy and his harm, Norman has met his burden to survive summary judgment as to his *Monell* claim against the County's monitoring policy.

### 2.    Failure to Train to Respond to Medical Needs

#### i.    Identifying the Policy

The County's training policy is to "provide for the training of Corrections personnel that complies with the State and American Correctional/Jail association Detention Standards and the requirements of the laws of the State of Oregon." Kaplan Decl. [ECF 164] Ex. 17 at 1. The County has contracted with Wellpath to provide trainings on more specific medical subjects. Kaplan Decl. [ECF 164] Ex. 1 at 6. Wellpath's trainings are generally administered by sending out an email with a PowerPoint. *Id.* Ex. 52 at 10:16–22; Smith Decl. [ECF 151] Ex. F at 7:19–8:14. Employees are not required to view these trainings and neither Wellpath nor the County track whether an employee completes the training in question. Kaplan Decl. [ECF 164] Ex. 52 at 11:3–23; Smith Decl. [ECF 151] Ex. F at 8:10–14.

#### ii.    Deliberate Indifference

A municipality's failure to train constitutes deliberate indifference if it follows "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). A single incident may give rise to *Monell* liability for failure to train only if "violations of constitutional rights" are a "highly predictable consequence" of the municipality's failure to train. *Id.* at 63–64.

Norman has not put forward evidence that indicates the County's training rises to the level of deliberate indifference. Yes, the County could have done much more to ensure its employees knew how to treat detainees who are detoxing. But deliberate indifference cannot be shown merely by "proving that an injury or accident could have been avoided if an employee had

had better or more training." *Id.* at 68 (cleaned up). Norman criticizes the County's practice of administering optional trainings over e-mail, Resp. to Cnty. [ECF 159] at 27, but "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Connick*, 563 U.S. at 68. Nothing in the record suggests that it was "patently obvious" to the County that optional PowerPoints—a common form of training in the modern workplace— would result in a constitutional deprivation. *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citation omitted). Certainly, it is troubling that the training method chosen by the County might result in a staff member not learning anything. Yet this outcome is possible with almost every training method; no pedagogy is immune to the threat of a limited attention span.

At bottom, the format of a training cannot support an inference of deliberate indifference on its own, and Norman raises no issue with the substance of the County's detoxification training. As such, I find that Norman has not shown deliberate indifference here. Accordingly, this *Monell* subclaim cannot stand.

### 3. Policy of Accepting Individuals with a BAC below 0.25

#### i.      Identifying the Policy

Next, Norman argues that the County has a policy of automatically accepting detainees for admission if their BAC is below 0.25. Resp. to Yamhill Cnty. [ECF 159] at 28. This is a mischaracterization. The policy actually states that "[n]o prisoner with a BAC of .25 or higher shall be admitted . . . without first obtaining medical clearance." Kaplan Decl. [ECF 164] Ex. 4 at 1. The policy does not automatically admit those with a BAC below .25; rather, it automatically rejects those with a BAC of .25 or above. Another policy specifies additional requirements for admitting an intoxicated patient. The patient cannot be "intoxicated to the point where he/she cannot understand simple questions or directions" and cannot be exhibiting any

two of a list of conditions, including physical tremors and an inability to recognize her current location. *Id.* Ex. 15 at 1.

### ii.    Deliberate Indifference

The County's policy does not exhibit deliberate indifference. Norman contends that an outside audit found that the policy was problematic, yet that audit post-dated Ms. Norman's death and merely determined that the .25 BAC requirement should be adjusted depending on certain characteristics of the detainee. *Id.* Ex. 37 at 3. Norman points to no facts that would have alerted the County to risks inherent to its admissions policies. *See* Resp. to Yamhill Cnty. [ECF 159] at 28.

### iii.    Causal Link

Nothing in the record indicates that the County's BAC requirement was a contributing cause in Ms. Norman's death. Without evidence of deliberate indifference or a causal link, Norman's BAC requirement subclaim cannot proceed.

### 4.  Failure to Screen and Provide Screening Training

The County has several screening policies for new detainees. *See, e.g.*, Ruby Decl. [ECF 150] Ex. A at 9–10, 46, 58–59. Norman does not raise any substantive issues with any of these policies. Resp. to Yamhill Cnty. [ECF 159] at 29–30. Instead, he argues that County employees were never trained on its screening policies. His only support for this assertion is a deposition from Sgt. Shipley where she was unable to define "detox protocol" and an email in which Sgt. Jeremy Ruby asked what intake questions a nurse would have asked Ms. Norman. Kaplan Decl. [ECF 164] Ex. 61 at 16:11–18; Ex. 36 at 2. At most, this evidence shows that some County employees had difficulty retaining the training they received. It does not support an inference that the County had a practice of failing to train its employees on screening policies entirely.

Because Norman has failed to support his allegations that the County had inadequate screening and training policies, this subclaim cannot survive summary judgment.

### 5. Staffing of LPNs and Understaffing

Norman alleges the County provided insufficient medical care by staffing LPNs instead of RNs. Resp. to Yamhill Cnty. [ECF 159] at 31. The County concedes that it had allowed Wellpath to staff LPNs instead of registered nurses (RNs) for certain shifts. Yamhill Cnty. Reply [ECF 174] at 22. However, Norman does not explain how staffing LPNs instead of RNs would constitute deliberate indifference. Nor does he explain how the fact that Pena was an LPN rather than an RN contributed to the death of Ms. Norman. *See* Resp. to Yamhill Cnty. [ECF 159] at 31.

Norman also alleges that the County had a policy of understaffing based on an email exchange between Wellpath and the County. *Id.* In this exchange, Michael Petrasek, the health services administrator for Wellpath, asked Sgt. Jason Mosiman, the jail captain for the County, to have deputies assist in the screening process. Kaplan Decl. [ECF 164] Ex. 24. Petrasek explained that assistance was necessary because Wellpath was "not capable of doing all the intakes" due to its "current staffing matrix." *Id.* Norman does not explain how occasional assistance from corrections deputies in the screening process would constitute deliberate indifference. Nor does he show that this alleged policy had any effect on Ms. Norman's death.

Because Norman makes no showing of deliberate indifference or causation for either contested policy, I grant summary judgment as to this subclaim.

### 6. Hiring Personnel Indifferent to the Medical Needs of Its Inmates

Here, Norman relies on an unpublished case that found that a municipality may be subject to *Monell* liability if a plaintiff alleges an "entrenched culture or posture of deliberate

indifference to others' constitutional rights." Resp. to Yamhill Cnty. [ECF 159] at 31–32 (citing *Bagos v. Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at *5 (E.D. Cal. Oct. 13, 2020)). Pointing to the deaths of Myers and Samples, Norman argues that the County cultivated indifferent attitudes among its staff and perpetuates those attitudes by failing to discipline personnel. *Id.*

In reply, the County observes that the plaintiff in *Bagos* alleged government officials had committed 23 prior constitutional violations without facing any discipline or retraining. Yamhill Cnty. Reply [ECF 174] at 24 (citing *Bagos*, 2020 WL 6043949, at *5). Additionally, that case dealt with a motion to dismiss, not a motion for summary judgment.

The County also contends that the facts Norman relies on do not demonstrate a culture of deliberate indifference. *Id.* at 24–26. I agree. Norman has not demonstrated that the deaths of Myers and Samples were due to deliberate indifference, let alone that those deaths are evidence of a culture of deliberate indifference. Moreover, the County took action in response to the Myers and Samples deaths: it sought a new health care provider, Wellpath. Norman also fails to identify facts supporting a causal link between this supposed lack of discipline and Ms. Norman's death. Accordingly, I grant summary judgment as to this subclaim.

### 7. Failure to Discipline Staff.

Lastly, Norman alleges the County had a policy of failing to discipline staff for violating County policy. Resp. to Yamhill Cnty. [ECF 159] at 33. This claim was not in Norman's first amended complaint; he asked to add it to his second amended complaint in his motion for leave to amend. Mot. for Leave to Amend [ECF 137] Ex. A ¶ 72(o)–(q). I declined, finding the amendment would be futile because a mere failure to discipline cannot support a § 1983 claim.

Op. & Order [ECF 169] at 5 (citing *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004)). As a result, this subclaim has already been dismissed and I need not consider it here.

### B. Negligence Claim

#### 1. Negligence by the County

The County essentially shifts its negligence claim to Wellpath. According to the County, it discharged its duty to Ms. Norman the moment it entrusted her to Wellpath medical personnel. Yamhill Cnty. Mot. for Summ. J. [ECF 149] at 17. It quotes the Restatement (Second) of Torts § 314A, which states that one who takes another into his custody "will seldom be required to do more than give first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician." The Restatement does not require the custodian "to give any aid to one who is in the hands of apparently competent persons who have taken charge of him." *Restatement (Second) of Torts § 314A.*

Norman argues that the County's "statutory duty to provide medical care is a nondelegable duty that [it] cannot contract away." Resp. to Yamhill Cnty. [ECF 159] at 35. But, as the County explains it, its duty "is not to provide the aid, but to get the prisoner in the hands of a health care professional who has the expertise to provide the aid." Yamhill Cnty. Reply [ECF 174] at 29.

Additionally, Norman argues that the County's "own employees and agents . . . themselves took action that unreasonably created a foreseeable risk of harm to inmates in its custody." Resp. to Yamhill Cnty. [ECF 159] at 34 (citing *Fazzolari ex rel Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326 (Or. 1987)). He then goes through the policies he challenged on as part of his *Monell* claim.

A *Monell* claim requires a higher showing of proof than a negligence claim. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.") (internal quotation omitted). Because Norman has identified a genuine dispute of material fact as to whether the County's monitoring policy is deliberately indifferent, he has *a fortiori* made the case that the monitoring policy is negligent.

Against this lower evidentiary threshold, I find that Norman's criticisms of the County's alcohol withdrawal training policies may form the basis of a negligence claim. While it is the substance of the training that matters for showing deliberate indifference, here it is the reasonableness of the training that matters. The record suggests that the County's only formal training on alcohol withdrawal was a brief, optional PowerPoint. Kaplan Decl. [ECF 164] Ex. 52 at 11:3–23; Smith Decl. [ECF 151] Ex. F at 8:10–14. Given the life-or-death stakes of alcohol withdrawal and its prevalence in prisons, a jury could reasonably view that the County's training policy as haphazard and unreasonable.

As with *Monell* claims, negligence claims must identify a causal link between the negligent act and the harm inflicted. *Watson v. Meltzer*, 270 P.3d 289, 293 (Or. Ct. App. 2011). Here, I find that Norman has put forward sufficient evidence of a causal connection between Norman's death and the County's training policy. The County has no evidence that the corrections deputies who interacted with Ms. Norman actually received any formal detoxification training at all. *See* Kaplan Decl. [ECF 164] Ex. 61 at 3:20–22. On this record, a jury could reasonably infer that the County's training policy left Ms. Norman in the hands of correctional staff that knew little about the proper treatment of alcohol withdrawal. One of Norman's experts posits that this lack of training caused Ms. Norman's death, opining that better-trained staff

would have recognized Ms. Norman's health risks and ordered more frequent assessment of her condition. Kaplan Decl. [ECF 164] Ex. 68 at 6. Having provided evidence of unreasonableness and a causal link, Norman's negligence claim as to the County's withdrawal training policy survives summary judgment.

The same cannot be said of Norman's other negligence subclaims against the County. Norman has failed to identify facts supporting an inference that any of the County's other policies were unreasonable or a cause of Ms. Norman's death. Accordingly, I grant summary judgment on Norman's negligence claim against the County, with the exception of his subclaims against the County's monitoring policy and its alcohol withdrawal training policy.

### 2. Vicarious Liability for Wellpath's Actions

Norman also argues that the County could be held vicariously liable for Wellpath's actions. Resp. to Yamhill Cnty. [ECF 159] at 35. The County concedes for the purposes of this motion that Wellpath is its agent. Yamhill Cnty. Mot. for Summ. J. [ECF 149] at 18. Relying on provisions in its contract with Wellpath that identified Wellpath as an independent contractor, the County contends that its relationship with Wellpath was that of a nonemployee agent. *Id.* at 19. A principal is only liable for the torts of its nonemployee agents if there is "a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the claim." *Vaughn v. First Transit, Inc.*, 206 P.3d 181, 187 (Or. 2009). The County asserts it had no control over the way that Wellpath treated its patients.

In response, Norman claims that the County had the right to control Wellpath. Resp. to Yamhill Cnty. [ECF 159] at 35. But he cites no evidence in support. As such, he has failed to meet his burden to show that the County should be held vicariously liable for the actions of Wellpath. *See Turner v. Multnomah Cnty.*, No. 3:12-CV-01851-KI, 2013 WL 5874570, at *4 (D.

Or. Oct. 30, 2013) (finding no vicarious liability where no evidence indicated the prison exercised control over a medical contractor).

### III.    Wellpath's Motion for Summary Judgment

Wellpath moves for summary judgment on Norman's § 1983 and gross negligence claims against it. Wellpath Mot. for Summ. J. [ECF 152] at 1. It does not seek summary judgment on Norman's negligence claim.

### A.    *Monell* Claim[1]

In his response to Wellpath's motion, Norman argues three Wellpath policies manifest deliberate indifference.

#### 1.    Policy for Treating Alcohol Withdrawal

I addressed this policy in my discussion on the County's monitoring policy, *supra* Part II(A)(1). Here, the posture is slightly different because Norman challenges Wellpath's entire withdrawal treatment policy, not just its monitoring recommendation. Nevertheless, a jury may find Wellpath's policy manifests deliberate indifference for the same reasons as the County's reliance on Wellpath. In sum, Wellpath's withdrawal policy gives medical staff 24 hours to treat and assess new arrivals. This 24-hour time limit governs all new arrivals, even those who are likely to require urgent medical care. Unless it receives a medical recommendation otherwise, Wellpath places detainees on an eight-hour watch, supplemented by the County's hourly watches. *See* Kaplan Decl. [ECF 164] Ex. 37 at 3. Norman has provided evidence that such a watch is far too infrequent to care for those who are experiencing alcohol withdrawal. *Id.* Ex. 67

---

[1] Wellpath is a private company, not the government. However, private parties may be liable under § 1983 when their conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Wellpath does not dispute that it acted under color of law.

at 6–7. And he has shown that this infrequent watch could have been the deciding factor in whether Ms. Norman survived. *Id.* at 7. As such, this subclaim may survive summary judgment.

### 2.  Policy of Providing Insufficient Medical Coverage

This subclaim is essentially identical to Norman's claim that the County acted with deliberate indifference in staffing LPNs instead of RNs. *Compare* Resp. to Wellpath [ECF 160] at 25–26 *with* Resp. to Yamhill Cnty. [ECF 159] at 31. As with that subclaim, Norman has failed to designate evidence showing that policy was deliberately indifferent or a cause of Ms. Norman's death. *See supra* Part II(A)(5). As such, I grant summary judgment as to this subclaim.

### 3.  Failure to Provide Detoxification and Screening Training

This claim seems to combine Norman's claim that the County failed to train its employees on detoxification protocol, *supra* Part II(A)(2), and his claim that it failed to train its employees on screening procedure, *supra* Part II(A)(4). *Compare* Resp. to Wellpath [ECF 160] at 26–28 *with* Resp. to Yamhill Cnty. [ECF 159] 26–28, 29–30. I grant summary judgment on this subclaim for the same reasons I granted it on those: Norman has failed to establish a genuine dispute of material fact as to deliberate indifference. *See supra* Part II(A)(2),(4).

## B.  Gross Negligence

The standard for gross negligence and deliberate indifference is functionally identical. *See Simpson v. Phone Directories Co.*, 729 P.2d 578, 579–80 (Or. Ct. App. 1986) ("Gross negligence is characterized by a state of mind which indicates conscious indifference to the rights of others or to the probable consequences of one's acts."). Because a reasonable jury could find that Wellpath's detoxification treatment policy exhibits deliberate indifference, a reasonable jury could also find that the policy is grossly negligent. And because Norman has failed to show that Wellpath's medical coverage or training policies are constitutionally deficient, he has

likewise failed to show they can be grounds for a gross negligence claim. I grant summary judgment on this subclaim.

## IV.   Individual Yamhill County Defendants

Norman levies § 1983 claims against four County employees: Sgt. Brooks, Dep. Shipley, Sheriff Svenson, and Sgt. Ruby. To show a government official violated a detainee's Fourteenth Amendment right to receive adequate medical care, a plaintiff must establish:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. The third element requires the plaintiff show "the defendant's conduct" was "objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071).

The Individual County Defendants assert qualified immunity as a defense. Indiv. Cnty. Defs.' Mot. for Summ. J. [ECF 146] at 1. Under the doctrine of qualified immunity, those acting under color of law are protected from liability unless "their conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal citation omitted). A clearly established right must be defined "with specificity and not at a high level of generality." *Gordon*, 6 F.4th at 968 (cleaned up).

### A. Deputy Michael Brooks

Dep. Brooks booked Ms. Norman when she first arrived at the jail and was stationed in the control room when Ms. Norman rolled off her bed up until her death. I will first discuss whether there was a constitutional violation before turning to whether the right was clearly established.

#### 1. Constitutional Violation

Norman argues that Dep. Brooks acted with deliberate indifference by failing to ensure Ms. Norman received more frequent monitoring. Essentially, the argument is that Dep. Brooks knew or should have known that 45-minute checks from corrections deputies with minimal medical training would be insufficient to adequately monitor Ms. Norman's state of withdrawal. Resp. to Indiv. Cnty. Defs. [ECF 162] at 7. In turn, the County argues that Dep. Brooks had no duty to assess Ms. Norman and that he reasonably placed her in the hands of medical staff. Indiv. Cnty. Defs.' Mot. for Summ. J. [ECF 146] at 14–16.

I break the claim against Dep. Brooks into two questions: (1) whether he acted with deliberate indifference by refusing to independently monitor Ms. Norman more frequently than the County's 45-minute default after he assisted with her intake; and (2) whether he acted with deliberate indifference by failing to monitor Ms. Norman from the control room.

#### i. Refusal to Order Additional Monitoring

For the first question, I agree with the County. Looking at the objective deliberate indifference elements outlined in *Gordon*, 888 F.3d at 1125, it is unclear whether Dep. Brooks even "made an intentional decision" regarding the frequency with which Ms. Norman was monitored. Instead, he appears to have simply deferred to County and Wellpath policy. Norman

has not put forward any evidence that Dep. Brooks had any influence over Ms. Norman's monitoring schedule; his failure to intervene is not deliberate indifference.

But even assuming Dep. Brooks's actions could be considered "an intentional decision," that put Ms. Norman "at substantial risk of suffering serious harm," Norman has failed to establish the third *Gordon* element: that a reasonable official in the defendant's circumstances would have appreciated the high degree of risk created by his choice. *Id.* Dep. Brooks knew that medical personnel had recommended Ms. Norman's monitoring schedule. *See* Kaplan Decl. [ECF 164] Ex. 30. He did not act unreasonably in relying on that recommendation.

As long as "a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Redding v. Dhaliwal*, Case No. CV 10-998-PK, 2011 WL 6153132, at *12 (D. Or. Oct. 4, 2011) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also Lemire*, 726 F.3d at 1084 (finding corrections staff did not act with deliberate indifference because "they reasonably relied on the expertise of the prison's medical staff"). To hold otherwise would create "a perverse incentive" for corrections officers "not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. *Redding*, 2011 WL 6153132, at *12 (quoting *Spruill*, 372 F.3d at 236). Accordingly, when a non-medical official "ha[s] reason to believe that [a] prisoner was receiving medical care, and lack[s] reason to believe that the medical care was being administered in a manner constituting mistreatment," that official "cannot properly be charged with deliberate indifference to [the] prisoner's medical needs." *Id.* at *13; *see also Nordenstrom ex rel. Estate of Perry v. Corizon Health, Inc.*, No. 3:18-cv-01754-HZ, 2021 WL 2546275, at *9 (D. Or. June 18, 2021) (finding corrections officers did not act

with deliberate indifference when they "repeatedly deferred to medical staff" despite having concerns a detainee "was at risk of having a serious medical emergency").

Dep. Brooks's only indicators that Ms. Norman was in medical danger were her poor balance, light tremors, and statement that she was starting to experience a withdrawal. Nevertheless, a hospital had cleared her for jail admission and medical staff had approved of her monitoring schedule. Kaplan Decl. [ECF 164] Ex. 30. Perhaps jurors could infer that Dep. Brooks knew that Nurse Pena's screening of Ms. Norman was brief, but nothing suggests Dep. Brooks was aware of any deeper problems with the care that Nurse Pena administered. And unlike the County, Dep. Brooks did not have reason to believe that Wellpath's policies were deficient. As such, his refusal to place Ms. Norman on more frequent monitoring cannot be considered deliberate indifference.

### ii.    Monitoring of Security Camera Footage

Dep. Brooks has no recollection of monitoring Ms. Norman during his shift. Brooks Decl. [ECF 147] ¶ 3. For summary judgment purposes, I assume he did not look at Ms. Norman's camera feed at all. As such, a jury could conclude that Dep. Brooks made a decision not to monitor Ms. Norman's feed and that this decision put Ms. Norman at a substantial risk of experiencing DT without timely aid.

The question, then, is whether a reasonable person in Dep. Brooks's situation would have known that his conduct created a risk of harm. Norman has not put forward sufficient evidence to put that question before a jury. Though Dep. Brooks had reason to suspect that Ms. Norman needed to be monitored, Smith Decl. [ECF 151] Ex. C at 7:14–18, he was aware that she was being periodically checked by other staff. At no point was Dep. Brooks instructed to provide additional monitoring of Ms. Norman from the control room. *See* Kaplan Decl. [ECF 164] Ex. 52

at 14:8–25. Nor did the County's security camera monitoring policies relegate any responsibility to monitor detainees who had not been placed on a special watch. *Id.* at 16:7–23. Accordingly, Dep. Brooks's failure to monitor Ms. Norman does not rise to the level of deliberate indifference.

### 2. Clearly Established Right

Even if Norman could prove Dep. Brooks acted with deliberate indifference, Dep. Brooks would be protected by qualified immunity. Norman relies on two cases to show that Dep. Brooks violated a clearly established right. Neither fits.

First, he points to *Nordenstrom*, 2021 WL 2546275, at *10, to support the notion that a corrections deputy violates the Constitution by "standing idly by" and failing to ensure the supply of medical help. Resp. to Indiv. Cnty. Defs. [ECF 162] at 9. But in *Nordenstrom*, video evidence showed the corrections deputies joking about the detainee's medical condition while the detainee was "moaning, yelling, writhing, and twisting his body uncontrollably." 2021 WL 2546275, at *2. Here, Ms. Norman's symptoms at her booking were much more understated; it is unclear whether Dep. Brooks even recognized them. Moreover, the record in *Nordenstrom* supported an inference that the corrections staff did not know whether medical staff was on its way to assess the detainee. Here, Dep. Brooks knew that Ms. Norman had received at least a cursory check-up from Nurse Pena. Thus, *Nordenstrom* is distinguishable.

Second, Norman points to *Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) for the more general proposition that, at the time of Ms. Norman's death, "it was 'clearly established that officers could not intentionally deny or delay access to medical care.'" Resp. to Indiv. Cnty. Defs. [ECF 162] at 10 (quoting *Clement*, 298 F.3d at 906). But even if such a broad rule had the specificity necessary to pierce qualified immunity, it does not apply here. Dep. Brooks turned Ms. Norman over to medical staff shortly after she entered the jail. This medical care was flawed, *see infra* Part V(A), but nothing in the record indicates that Dep. Brooks knew of any

deficiencies in the care that Ms. Norman had received. At the very least, nothing suggests that Dep. Brooks delayed Ms. Norman's receipt of medical care. As such, the generalized rule Norman identifies in *Clement* does not defeat Dep. Brooks's qualified immunity.

Norman cites no case that would establish a right to receive diligent check-ins or monitoring via security camera. Such a right would not have been clearly established at the time of Ms. Norman's death in 2018. Just last year, the Ninth Circuit held that it was "not aware of any precedent expressly recognizing a detainee's right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon*, 6 F.4th at 972. Though *Gordon* ultimately held that pretrial detainees do have such a right, it did so three years after Ms. Norman's death. *Id.*

### B.  Sergeant Barbara Shipley

Sgt. Shipley was the shift supervisor on the night of Ms. Norman's death. Kaplan Decl. [ECF 164] Ex. 59 at 4:23–5:5. Like Dep. Brooks, she assisted in Ms. Norman's booking process and later conducted check-ins of Ms. Norman's cell. She also was the one who discovered Ms. Norman unconscious on the ground and began resuscitation efforts.

Norman lumps Sgt. Shipley in with Dep. Brooks, arguing that she acted with deliberate indifference by failing to monitor Ms. Norman with more frequency. Resp. to Indiv. Cnty. Defs. [ECF 162] at 5–9. As the shift supervisor, Sgt. Shipley had greater control over the watch schedule than Dep. Brooks, but County policy nevertheless required that she defer to the recommendations of medical staff. Accordingly, I grant summary judgment on Norman's § 1983 claim against Sgt. Shipley for the same reason as the claim against Dep. Brooks: deference to medical staff is not grounds for deliberate indifference

### C.  Sheriff Tim Svenson

Sheriff Tim Svenson supervised jail operations. Smith Decl. [ECF 151] Ex. H at 4:9–12.

A supervisor may be liable under § 1983 if he was either personally involved in the

constitutional deprivation or if his wrongful conduct was a cause of the constitutional violation.

*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). "[T]he supervisor need not be directly and

personally involved in the same way as are the individual officers who are on the scene inflicting

constitutional injury." *Id.* (quoting *Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991)).

Instead, the supervisor can be held liable based on "his 'own culpable action or inaction in the

training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional

deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous

indifference to the rights of others.'" *Id.* at 1205–06 (quoting *Larez*, 946 F.2d at 646).

### 1.  Constitutional Violation

Norman argues that Sheriff Svenson violated Ms. Norman's constitutional rights by

creating—or at least failing to change—the policies and practices that led to Ms. Norman's

death. Resp. to Indiv. Cnty. Defs. [ECF 162] at 9–12. In the wake of the Samples and Myers

deaths, Sheriff Svenson publicly assumed responsibility to "address[] all issues" related to their

deaths "unflinchingly." Kaplan Decl. [ECF 164] Ex. 50 at 2. He assured the public that "[t]he

buck, as they say, stops" with him. *Id.*

As explained previously, *supra* Part II(A)(1), only the County's monitoring policy

supports an inference of deliberate indifference. Sheriff Svenson did not promulgate this policy;

it likely preceded his employment with the County. The County's monitoring policy was drafted

in 2001, with the most recent revision in 2011. Kaplan Decl. [ECF 164] Ex. 15 at 1. In 2013,

Sheriff Jack Crabtree instituted another monitoring policy. *Id.* Ex. 25.[2] However, the deaths of Samples and Myers put Sheriff Svenson on notice that the County's monitoring protocol was lacking. Nevertheless, Sheriff Svenson did nothing to change it.

The record supports an inference that Sheriff Svenson acted with deliberate indifference by failing to revise the County's monitoring policy. Despite his public commitment to make life-saving improvements to the County jail, Sheriff Svenson made no significant changes to a policy that he should have known puts detainees at a significant risk. Had Sheriff Svenson instituted clearer monitoring policies, Ms. Norman could have been discovered and treated earlier than she was. To her, this could have meant the difference between life and death. *See* Kaplan Decl. [ECF 164] Ex. 67 at 7.

### 2.  Clearly Established Right

To defeat qualified immunity, Norman again relies on *Clement* and its progeny. Oral Arg. Tr. [ECF 191] at 52:25–53:1. These cases hold that "'a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition.'" *Gordon*, 6 F.4th at 972 (quoting *Sandoval*, 985 F.3d at 679–80)). In the policymaking context, these cases highlight a prison's need for adequate emergency response protocols. This responsibility is distinct from a prison's need for adequate monitoring protocols, which was not clearly established until after Ms. Norman's death. *Id.* Accordingly, qualified immunity shields Sheriff Svenson from individual liability.

---

[2] Though the County argues that it "overhauled" its medical care systems following the deaths of Myers and Samples, Indiv. Yamhill Cnty. Defs.' Reply [ECF 175] at 23, its monitoring policy did not change with the arrival of Wellpath.

### D.  Sergeant Jeremy Ruby

Sgt. Ruby was the Acting Jail Commander when Ms. Norman died. Kaplan Decl. [ECF 164] Ex. 59 at 2:15–16. As commander, Sgt. Ruby was responsible for ensuring County employees were properly trained and followed procedure. *Id.* at 3:1–4; *id.* Ex. 47 at 1. Norman does not claim Sgt. Ruby had any policymaking function. *See* Resp. to Indiv. Cnty. Defs. [ECF 162] at 10. Nor does he contend Sgt. Ruby had any direct involvement in Ms. Norman's death. *See id.*

#### 1.  Constitutional Violation

Norman alleges Sgt. Ruby violated Ms. Norman's constitutional rights by failing to train corrections staff or correct their unconstitutional actions. *Id.* at 9–12. But "[a] mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle*, 382 F.3d at 987. As for failure to train, Norman does not point to any specific facts omitted from the County's trainings that, if included, would have saved Ms. Norman's life. Accordingly, he has failed to show a causal connection necessary to establish a constitutional violation.

#### 2.  Clearly Established Right

Likewise, Norman fails to offer any case that would have made clear to Sgt. Ruby that any of his actions violated the Constitution. *See* Resp. to Indiv. Yamhill Cnty. Mot. for Summ. J. [ECF 162] at 9–12. As such, he has failed to meet his burden to show Sgt. Ruby violated a clearly established right. *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

### V.    Individual Wellpath Defendants

Lastly, Norman has made § 1983 claims against three Wellpath employees: Nurse Pena, Dr. Mitchell, and Nurse Petrasek. Wellpath does not contend that any of its employees are entitled to qualified immunity, so I need not address whether any constitutional right they

violated was clearly established. *See Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) (qualified immunity is a waivable affirmative defense).

### A.  Nurse Darla Pena

Nurse Pena conducted a brief medical evaluation when Ms. Norman first arrived at the jail. She then called Dr. Mitchell, described Ms. Norman's situation, and followed his recommendation to start her treatment in the morning. "Prison officials violate the Constitution when they choose a course of treatment that is 'medically unacceptable under all of the circumstances.'" *Gordon*, 6 F.4th at 970 (quoting *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)). In the Fourteenth Amendment context, the official must arrive at the decision with objective deliberate indifference to "an excessive risk to plaintiff's health." *Id.* There must also be a causal connection between the treatment plan and the plaintiff's injuries. *See Gordon*, 888 F.3d at 1125.

### 1.  Deliberate Indifference

Norman argues that Nurse Pena acted with deliberate indifference by failing to adequately assess Ms. Norman's condition or obtain information about her condition and medication from the hospital that had discharged her. Resp. to Wellpath Indiv. Defs. [ECF 161] at 3–4. Norman argues that Nurse Pena acted unreasonably in her assessment of Ms. Norman and in her deference to Dr. Mitchell's diagnosis.

I agree with Norman that Nurse Pena's actions could support an inference of deliberate indifference. Despite Ms. Norman's tremors, previous high level of intoxication, and her statement that she was going through alcohol withdrawal, Nurse Pena met with Ms. Norman for no more than a few minutes. She did not conduct any kind of medical assessment. Though Nurse Pena had reviewed some of Ms. Norman's medical history, those records did not indicate the dosages of the medication that Ms. Norman had received at Providence Newberg. Kaplan Decl.

[ECF 164] Ex. 57 at 8:1–7.  One of Norman's expert witnesses, Dr. Powers, opines that Nurse

Pena should have known that Ms. Norman was at a high risk of alcohol withdrawal and that she

deviated from the necessary standard of care by failing to take a CIWA or acquire more detailed

medical records. Kaplan Decl. [ECF 164] Ex. 67 at 4, 6. Dr. Powers also finds that failing to put

Ms. Norman on medical watch despite her symptoms and medical history was "beyond a

reasonable mistake." *Id.* at 6.

Wellpath posits that reasonable medical decisions are generally entitled to deference.

Indiv. Wellpath Defs.' Mot. for Summ. J. [ECF 153] at 10–11 (citing *Kellogg v. Kitsap Cnty.*,

No. C12-5717 RJB, 2013 WL 4507087, at *4 (W.D. Wash. Aug. 22, 2013)). But medical

decisions are not entitled to deference when they were made with deliberate indifference. In

*Sandoval*, a corrections deputy told a nurse that a "sweating" and "disoriented" patient was in

need of "a more thorough look." 985 F.3d at 680. Nevertheless, the nurse did "nothing more than

perform a quick 10-second blood test." *Id.* The Ninth Circuit held that a reasonable jury could

conclude the nurse had acted with deliberate indifference. Viewed in the light most favorable to

Norman, Nurse Pena's evaluation was similarly superficial. Like the nurse in *Sandoval*, Nurse

Pena had clear indications that her patient had a severe medical condition. And like the nurse in

*Sandoval*, a jury could find that Nurse Pena "fail[ed] to provide any meaningful treatment." *Id.*

Accordingly, the decisions that Nurse Pena made in treating Ms. Norman are not entitled to the

deference normally given to medical decisions.

Wellpath makes two other arguments in Nurse Pena's defense: (1) Ms. Norman refused

medical care, so Nurse Pena could not conduct a more thorough evaluation; and (2) Ms. Norman

reasonably deferred to Dr. Mitchell. I address each in turn.

### i.    Refusal of Medical Care

According to Nurse Pena's deposition testimony, Ms. Norman declined when Nurse Pena asked whether she could administer a CIWA. Gardner Decl. [ECF 176] Ex. T at 10:5–10. Wellpath argues that respect for Ms. Norman's right to refuse medical care, not deliberate indifference, led to Nurse Pena's decision not to conduct a CIWA until later. Indiv. Wellpath Defs.' Mot. for Summ. J. [ECF 153] at 5. This argument is untenable for three reasons.

First, Dr. Powers opines that Ms. Norman should have been placed on medical watch on the basis of her expressed withdrawal symptoms, prior BAC of .522, and "knowable medical history of prior serious withdrawals." Kaplan Decl. [ECF 164] Ex. 67 at 6. So even if Ms. Norman had knowingly refused a CIWA, a reasonable jury could still find that Nurse Pena violated Ms. Norman's rights by failing to put her on a closer watch.

Second, Norman has pointed to several facts that undermine Nurse Pena's assertion that Ms. Norman refused medical care. The alleged refusal is not documented in any of the reports on Ms. Norman's death. Contrary to County policy, *id.* Ex. 18 at 2, Nurse Pena did not fill out a form documenting the refusal of treatment. Neither Sgt. Shipley nor Dep. Brooks—who were within earshot—have testified that they heard Ms. Norman's alleged refusal of treatment. Norman's corrections expert opines that the lack of documentation or corroboration here "is both unheard of and unfathomable." *Id.* Ex. 75 at 7. This is viable impeachment evidence; a jury could reasonably rely on it and disregard Nurse Pena's testimony that Ms. Norman refused medical treatment.

And third, Ms. Norman may not have had the mental capacity to make her own medical decisions when Nurse Pena asked to take her vitals. Ms. Norman's BAC was still well above the legal limit, and she had just reported she was starting to go through alcohol withdrawal. A

reasonable jury could find that Nurse Pena should have at least clarified whether Ms. Norman

was cogent enough to decline potentially life-saving care.

For summary judgment purposes, I find that these three reasons create a genuine dispute

of material fact as to whether Ms. Norman's refusal of a medical examination excused Nurse

Pena's failure to treat her.

### ii.    Deference to Dr. Mitchell

The closer question is whether Nurse Pena reasonably relied on Dr. Mitchell's medical

recommendation that Nurse Pena wait to administer treatment until the morning. Indiv. Wellpath

Defs.' Mot. for Summ. J. [ECF 153] at 12. As discussed previously, *supra* Part IV(A)(1)(i), non-

medical officials are generally not deliberately indifferent when they defer to the judgment of

medical staff. *Redding*, 2011 WL 6153132, at *13. In *Storm v. Twitchell*, the District of Idaho

held that a similar principle extends to nurses: they are generally not deliberately indifferent

when they act pursuant to a supervising physician's order. No. 1:12-cv-00179-CWD, 2014 WL

4926119, at *6 (D. Idaho Sept. 29, 2014).

Nurse Pena is distinguishable from both the corrections staff in this case and the nurse in

*Storm*. Unlike Dep. Brooks and Sgt. Shipley, Nurse Pena is a medical professional. Moreover,

she had reason to know that a treatment recommendation from Dr. Mitchell would be inadequate

because it was based on the deficient evaluation that she herself had conducted. Given the nature

of alcohol withdrawal and Ms. Norman's medical history, Nurse Pena had compelling reasons to

disagree with Dr. Mitchell's finding that infrequent monitoring would be an acceptable medical

outcome.

Likewise, the nurse in *Storm* had no reason to think that the physician's diagnosis was

inadequate. The nurse took the patient's vitals frequently and treated him over the course of three

weeks. *Storm*, 2014 WL 4926119, at *6. She kept the supervising physician informed, and the patient stayed stable throughout. *Id.* Moreover, the supervising physician made a reasonable treatment plan, albeit one that the patient disagreed with. *Id.* In contrast, here the record supports a finding that Nurse Pena and Dr. Mitchell made unreasonable treatment decisions based on insufficient information. *See* Kaplan Decl. [ECF 164] Ex. 67 at 5 (describing Ms. Norman's treatment as "a gross departure from the standard of medical care expected from a reasonable medical professional in this setting").

Based on this record, a jury could reasonably find that Nurse Pena knew or should have known that Ms. Norman was at a severe risk of alcohol withdrawal. Moreover, a jury could find that Nurse Pena knew or should have known that, based on the limited information she and Dr. Mitchell had, Dr. Mitchell's treatment plan was substantially likely to result in harm. Thus, a jury could find that Nurse Pena acted with deliberate indifference.

### 2. Causal Connection

Wellpath argues that Norman has failed to establish a causal connection between Nurse Pena's treatment of Ms. Norman and her eventual death. Indiv. Wellpath Defs.' Reply [ECF 173] at 5–6. As I have already held, *supra* Part II(A)(1)(iii), Norman has established a causal connection between Ms. Norman's death and the infrequent monitoring schedule she was put on. However, for Nurse Pena, Norman must close a slightly different loop: he must put forward evidence that but for Nurse Pena's deliberate indifference, Ms. Norman would have placed on closer monitoring.

Nurse Pena's failure to order additional testing of Ms. Norman cannot close this loop. Given the possibility that Ms. Norman died of ventricular arrhythmia rather than DT, Gardner

Decl. [ECF 176] Ex. Q at 2–3, Norman cannot put forward sufficient evidence that a CIWA would have revealed the kind of vital signs that would warrant closer monitoring.

However, Norman has provided testimony that, given Ms. Norman medical history, a reasonable medical professional in Nurse Pena's position would have ordered medical monitoring regardless of what her vitals read. Kaplan Decl. [ECF 164] Ex. 67 at 6. This evidence suggests that a more reasonable nurse in Nurse Pena's position would have placed Ms. Norman on a more frequent monitoring schedule, thus preventing her death. Accordingly, Norman's § 1983 claim against Nurse Pena survives summary judgment.

### B. Dr. Hal Mitchell

Dr. Mitchell was the physician on call when Ms. Norman was admitted to the jail. Smith Decl. [ECF 151] Ex. E at 41:9–11. I allow the core claim against Dr. Mitchell to proceed for similar reasons as the claim against Nurse Pena. Despite clear warning signs, Dr. Mitchell failed to appreciate the severity of Ms. Norman's circumstances. Faced with a condition that can deteriorate rapidly, he recommended a delay in treatment. And even though Dr. Mitchell knew that he was operating on limited information and that better data was readily available—through a CIWA or a simple call to Providence Newberg—Dr. Mitchell did nothing to investigate Ms. Norman's situation further. Taking these factors into account, a jury could conclude that Dr. Mitchell's recommendation to withhold treatment until the morning "'was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.'" *Storm*, 2014 WL 4926119, at *6 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998)).

Norman also seeks to hold Dr. Mitchell liable for training medical staff according to the County and Wellpath's allegedly deficient policies. Resp. to Indiv. Wellpath Defs. [ECF 161] at

6–8. But Norman has not put forward any evidence that Dr. Mitchell "set [these policies] in motion" or that he had authority to terminate them. *Larez*, 946 F.2d at 646. Thus, Dr. Mitchell cannot be held liable for County or Wellpath policies.

### C.  Nurse Michael Petrasek

Nurse Petrasek is Wellpath's Health Services Administrator. Kaplan Decl. [ECF 164] Ex. 58 at 2:1–4. In this capacity, Nurse Petrasek was responsible for monitoring medical training at the jail. Norman claims that Nurse Petrasek violated Ms. Norman's right to medical care by providing inadequate medical training to Wellpath and County employees and for promulgating the jail's withdrawal policy. Resp. to Indiv. Wellpath Defs. [ECF 161] at 6–9. But, as I have explained neither the County nor Wellpath's training practices are constitutionally deficient. *Supra* Part II(A)(2), (4); Part III(A)(3). And Norman fails to put forward any evidence that Nurse Petrasek was responsible for or had the authority to change the monitoring policy that I found could be grounds for a § 1983 claim. As such, I grant summary judgment on this claim, too.

//

//

//

//

//

//

//

//

//

//

**CONCLUSION**

For the reasons explained above, I deny Yamhill County's motion [ECF 149] as to Norman's *Monell* claim against the County's monitoring policy and his negligence claims against the County's monitoring and training policies. I grant the County's motion on all other grounds. I deny Wellpath's motion [ECF 152] as to Norman's *Monell* and gross negligence claims against Wellpath's alcohol withdrawal policy. I grant Wellpath's motion on all other grounds. I grant the Individual Yamhill County Defendants' motion [ECF 146]. I deny the Individual Wellpath Defendants' motion [ECF 153] as to Nurse Pena and Dr. Mitchell. I grant the Individual Wellpath Defendants' motion as to Nurse Petrasek.

IT IS SO ORDERED.

DATED this __13__ day of May, 2022.

*Michael W. Mosman*
MICHAEL W. MOSMAN
Senior United States District Judge